**Thomas McCABE, et al.,
Plaintiffs, Appellants,**

v.

**Daniel RATTINER, et al.,
Defendants, Appellees.**

No. 86–1032.

United States Court of Appeals,
First Circuit.

Argued Dec. 2, 1986.
Decided March 30, 1987.

William C. Kollman, II with whom Holth Kollman & Fairlie, New London, Conn., and John C. Levanti, Westerly, R.I., were on brief for plaintiffs, appellants.

Joseph V. Cavanagh, Jr. with whom Blish & Cavanagh, Knight Edwards, Jeffrey C. Schreck and Edwards & Angell, Providence, R.I., were on brief for defendants, appellees.

Before COFFIN, BOWNES and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

This case takes us to the juncture between the law of defamation and the first amendment, where courts have developed the doctrine of constitutionally protected opinion. *See, e.g., Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985); *Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781 (9th Cir.1980); *Buckley v. Littell,* 539 F.2d 882 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 777 (1977). Although we have considered this doctrine previously, we have never used it as the basis for our decision. *See Bose Corp. v. Consumers Union of United States, Inc.,* 692 F.2d 189, 193–94 (1st Cir.1982). Accordingly, it is required that we devote some time to explaining the development of this doctrine and our reasons for adopting it in this case.

*The Mistaken Scam*

On August 31, 1984, appellee Daniel Rattiner published a first person article in the *Block Island Times* relating his encounter with Island Manor Resort, a timeshare condominium development owned by appellant Thomas McCabe. The article, "Selling Timesharing on the Street," described how an Island Manor salesman induced Rattiner

and his wife to look at the condominiums by offering a free lobster dinner. After the couple failed to respond to the sales pitch, the lobster dinner was forgotten, until Rattiner later returned and insisted that he be given what he was promised.

In the course of the narrative, Rattiner related various facts about the condominiums, the sales techniques, and the financial arrangements involved. He mentioned McCabe's name once, as the owner of the resort, and also described how McCabe ordered his salespeople to make good on their promise of a lobster dinner to the Rattiners. The article closed with a series of questions regarding the propriety of time-share condominiums on Block Island, leaving the clear impression that the author opposed them.

The basis of this lawsuit appeared in the carryover headline on the second page of the article (called a "jumpline" in publishing terminology): the one word, "Scam." At trial Rattiner testified that he did not intend that "Scam" be the jumpline. His assistant inserted it by mistake. Nevertheless, he did think that the operation was a scam.

At the close of evidence, the trial judge directed a verdict for defendant Rattiner. First, in a ruling that is not challenged on appeal, the judge found that Thomas McCabe and Island Manor Resort were public figures for at least the limited purpose of the timeshare controversy. Then, using an analysis very similar to that outlined by the plurality opinion in *Ollman v. Evans, supra,* although somewhat more influenced by Professor Keeton's law review article,[1] the trial court found further that the jumpline represented defendant's opinion and that it was constitutionally protected. Thomas McCabe appealed.

*The Doctrine of Constitutionally Protected Opinion*

The doctrine of constitutionally protected opinion is an attempt to reconcile the conflict between defamation law, which has as a major purpose the compensation of individuals for speech that harms them, and the first amendment, which has among its purposes the protection of free speech. In dictum, the Supreme Court referred to the distinction between opinion and false statements of fact in *Gertz v. Robert Welch,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974), as follows:

> [U]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide open" debate on public issues."

(Citations and footnote omitted). Courts saw this distinction as a bright line demarcating when defamation law must give way to the mandates of the first amendment.

However, courts that have tried to apply the fact/opinion distinction have discovered that speech does not always break down into such clear categories. *See, e.g., Ollman v. Evans,* 713 F.2d 838, (D.C.Cir. 1983), *reh'g granted and vacated,* 750 F.2d 970 (1984) (en banc), *cert. denied,* 471 U.S. 2662, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985) (differing on whether the statement in an op-ed article that a professor "has no status within the profession but is a pure and simple activist" is a statement of fact or opinion). For guidance they have turned to two Supreme Court opinions that, while not framed precisely in terms of the *Gertz* dictum, involve similar distinctions.

The first case, *Greenbelt Cooperative Publishing Assn. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), concerned a newspaper article reporting that citizens had characterized a developer's negotiating position as "blackmail." The Court stated that the publication was protected because the article clearly and accurately described the dispute and, in context, "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet...." Courts

---

1. *See* Keeton, Defamation and Freedom of the Press, 54 Tex.L.Rev. 1221 (1976).

have interpreted this case to mean that statements must be examined in the context of the article in which they appear. *See, e.g., Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). While the statement "X is a blackmailer" appears, in isolation, to be a criminal allegation, in the context of a well reported public event, the statement can represent the opinion that X's tactics are not good for the city and ought to be challenged.

The second case, *Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), expands the importance of *context.* That case concerned a newsletter issued during a strike that published a list of "scabs" along with a vituperative definition of a scab generally attributed to Jack London. *See id.* 418 U.S. at 268, 94 S.Ct. at 2773. In ruling that the publication was protected, the court referred to the climate of a labor strike and the light in which people would read a union newsletter. The Court concluded:

> Such words were obviously used here in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization. Expression of such an opinion, even in the most perjorative terms, is protected under federal labor law. Here, too, "there is no such thing as a false idea...." *Gertz v. Robert Welch, Inc.,* 418 U.S. at 339–40, 94 S.Ct. at 3006–07.

418 U.S. at 284, 94 S.Ct. at 2781. While *Letter Carriers* was decided under principles of labor law, its referral to the *Gertz* dicta, along with its distinction between fact and opinion, make it important precedent.

■ Building on this base, courts have developed the doctrine of constitutionally protected opinion into an examination of the "totality of the circumstances" surrounding an alleged defamation. *See, e.g., Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781 (9th Cir.1980). While the cases refer liberally to the opinion/fact distinction, courts recognize that these categories are only a guide. Depending upon the context, a statement of fact may be protected while a statement of opinion may not. *See, e.g., Ollman v. Evans,* 750 F.2d at 982; Restatement (Second) of Torts § 566 comment c.

■ Courts differ somewhat in the factors they apply in evaluating the totality of the circumstances, and in the extent to which they admit to applying any "mechanical" factor analysis at all. *Compare Lewis v. Time, Inc.,* 710 F.2d 549 (9th Cir.1983) ("three factors important in determining whether a statement is fact or opinion") *and Ollman v. Evans,* 750 F.2d 970 (D.C. Cir.1984) (four factors) *with Ollman v. Evans,* 750 F.2d at 993 (Bork, J., concurring) (factor analysis is too rigid). Nevertheless, they do share in common an approach that analyzes the alleged defamation in the context of the article in which it appears along with the larger social context to which it relates. We adopt that approach here. In considering whether the jumpline, "scam," was protected speech, we will examine the statement itself, the article as a whole, and its social context, much as the district court did below.

### The Scam in Context

Beginning with the statement itself, we observe that the word "scam" does not have a precise meaning. As the district judge said in his bench ruling, "it means different things to different people ... and there is not a single usage in common phraseology." While some connotations of the word may encompass criminal behavior, others do not.[2] The lack of precision makes the assertion "X is a scam" incapable of being proven true or false. *Cf. Buckley v. Littel,* 539 F.2d 882, 895 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 777 (1977) ("[t]he issue of what constitutes an 'openly fascist' journal is as much a matter of opinion or idea as is the question what constitutes 'fascism' or the 'radical right' ").

---

**2.** In this respect "scam" differs substantially from the word "blackmail," which was the statement at issue in *Greenbelt Cooperative Publishing, supra.*

Examining the statement in the context of Rattiner's article makes this last point more clear.[3] Rattiner extensively and accurately described his encounter with the resort salespeople, thereby disclosing the basis for his assertion that it was a scam. Readers may have disagreed with the conclusion that it was a scam, but they could not have said that the conclusion was false, because there is no core meaning of scam to which Rattiner's facts and allegation can be compared. Is it a scam to promise a lobster dinner and then only give it after protest? Is it a scam to gross approximately $9 million from a 25 unit resort? The answer depends on the meaning given to the word "scam." In this sense, the article is as much an opinion about the meaning of "scam" as it is an opinion about whether the encounter was a scam.

One further aspect of the article reinforces our conclusion that the statement was protected. Rattiner wrote the article in first person narrative style, explicitly raising questions about a matter of public concern. This style of writing puts the reader on notice that the author is giving his views. While opinion pieces may contain defamatory statements, these pieces are unlikely to convey the impression that an imprecise and unverifiable statement is meant to be a statement of fact.

Finally, while the social context of the article is not necessary to our decision, we note that that context supports our decision. In the context of public debate over a matter of community concern, first person narrative articles relating to that matter are commonly understood to be attempts to influence that public debate. *See Ollman v. Evans,* 750 F.2d at 986. *Cf. Letter Carriers,* 418 U.S. at 284–86, 94 S.Ct. at 2781–82. There was a public controversy over time-sharing on Block Island. McCabe injected himself into that controversy by developing a time sharing condominium and by simultaneously running for the Block Island Town Council. In so do-

ing, he voluntarily subjected himself to statements expressing strong opinions about the merits of his venture. McCabe cannot use the courts to muffle such opinions, because to do so would threaten the freedom of public debate that lies at the core of our democracy.

*Appellants' Negligence and Evidentiary Claims*

Before concluding we must address two additional issues appellants raise. The first claim is that appellants are entitled to a cause of action for the harm suffered as a result of Rattiner's negligence in allowing the jumpline to appear. This claim is easily disposed of; we will not punish defendant for accomplishing through mistake what he was privileged to do intentionally.

The second claim is that the judge should have admitted expert testimony regarding the meaning of the word "scam" as used in Rhode Island newspapers. The district court has broad discretion in admitting expert testimony. *See, e.g., Hamling v. United States,* 418 U.S. 87, 125, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590, *reh'g denied,* 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974). We cannot say that the trial judge's determination that the testimony would not "assist the trier of fact" is an abuse of that discretion. *See* Fed.R.Evid. 702.

*Conclusion*

In summary, the jumpline was, in context, protected speech. Accordingly, the judgment of the trial court is *affirmed.*

---

3. Appellants' contention that the jumpline should not be examined in the context of the article is both contrary to the case law and common sense. The jumpline, taken alone, made no reference to anyone. The only way to find out that it referred to McCabe and Island Manor resorts was to read the article. Having read the article, the reader would take the headline in context with the facts as spelled out in the body of the article.