LEVINSKY'S, INC., Plaintiff, Appellee,

v.

**WAL–MART STORES, INC.,
Defendant, Appellant.**

No. 97–1329.

United States Court of Appeals,
First Circuit.

Heard July 29, 1997.

Decided Sept. 26, 1997.

Jonathan S. Piper, with whom Charles J. Glasser, Jr., Preti, Flaherty, Beliveau & Pachios, Peter J. DeTroy, Russell B. Pierce, Jr., and Norman, Hanson & DeTroy, Portland, ME, were on brief, for appellant.

Karen Frink Wolf, with whom Harold J. Friedman and Friedman & Babcock, Portland, ME, were on brief, for appellee.

Before SELYA and LYNCH, Circuit Judges, and POLLAK,* Senior District Judge.

SELYA, Circuit Judge.

Our enduring national devotion to freedom of expression, embodied in the First Amendment and renewed in *New York Times Co. v.*

*Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), inevitably means that much offensive and inaccurate speech will remain free from legal constraints. Still, there are boundaries past which speakers cannot trespass. This case illustrates how difficult it is to trace those boundaries with the precision that the law demands.

## I. STORE WARS

The events that gave rise to this litigation are controversial but, for the most part, not controverted. We present a balanced synopsis here.

The plaintiff, Levinsky's, Inc. (Levinsky's), is a family-owned business that operates three retail clothing stores in Maine. It has deep roots in the community. The defendant, Wal–Mart Stores, Inc. (Wal–Mart), is the nation's largest retailer. It is a relative newcomer to the Maine marketplace. The two compete head to head in the Portland area.

In the fall of 1994, Levinsky's decided to run a tongue-in-cheek radio advertisement that forged a comparison between it and Wal–Mart. A snippet from the ad reflects its tone: "Levinsky's has a great selection and the lowest prices in Maine on Levi's jeans, Dockers and denim shirts. Wal–Mart doesn't carry Levi's, but we did get a good buy on a toaster." The spot aired in the Portland area for about six weeks during the pre-Christmas shopping season.

Intrigued by the unorthodox advertising campaign, Michael Boardman, a free-lance writer for the Portland business magazine *Biz*, decided to write a "David versus Goliath" story about Levinsky's aggressive reaction to Wal–Mart's entry into the marketplace. The article appeared in *Biz*'s January/February 1995 issue under the headline "Levinsky's: Leaner and meaner with retail competition." In the text, Boardman compared Levinsky's to a "feisty kid who fights the school bully for his lunch money."

While researching the story, Boardman telephoned Gilbert Olson, the manager of Wal–Mart's store in Scarborough, Maine (a

---

* Of the Eastern District of Pennsylvania, sitting by designation.

Portland suburb). Olson testified that he thought Boardman was a college student researching a paper, but Boardman maintained that he clearly identified himself as a journalist and stated the purpose of his call. At any rate, Olson made two statements during his conversation with Boardman that lie at the epicenter of this appeal. First, he described a Levinsky's store as "trashy." Second, he stated that when a person called Levinsky's, "you are sometimes put on hold for 20 minutes—or the phone is never picked up at all." *Biz* printed these (and other) remarks, attributing them to Wal–Mart.

Shortly thereafter, Levinsky's and several family members sued Wal–Mart for defamation, injurious falsehood, false light, deceptive trade practices, interference with advantageous economic relations, and infliction of emotional distress. Their complaint, filed in the federal district court under diversity jurisdiction, 28 U.S.C. § 1332(a) (1994), sought $40,000,000 in compensatory and presumed damages, plus punitive damages equal to 2% of Wal–Mart's net worth. Most of these claims were weeded out before or during trial.[1] The defamation claims survived. The jury found that the individual family members had not been defamed, but awarded Levinsky's $600,000 for presumed damages to reputation (notwithstanding the lack of any specific evidence of actual pecuniary loss). The jury also determined that Olson had not acted with ill will and declined to award Levinsky's exemplary damages.

The district judge upheld the verdict and made several rulings that bear on this appeal. First, the judge found that the verdict did not offend the First Amendment because both the word "trashy" and the "20 minutes on hold" comments stated opinions that implied provably false facts. Second, because Olson's statements related to Levinsky's business, the judge concluded that presumed damages were available. Third, emphasizing Olson's subjective belief that he was not speaking to a reporter but to a university student, the judge determined that Olson's comments did not relate to a matter of public

concern, and that, therefore, Levinsky's did not need to show actual malice as a precondition to the award of presumed damages. Fourth, the judge ruled that, under Maine's defamation per se doctrine, a finding of defamation that related to the plaintiff's business established legally sufficient fault and thus obviated any need for a jury instruction on negligence.

## II. A SHOPPING LIST

This appeal offers a large inventory of interleaved legal issues. We pick our way through that inventory by traversing the intersection of the First Amendment and state defamation law as it has developed over time, noting, inter alia, a restriction on the scope of defamation imposed by Maine law. We next discuss one of the two allegedly defamatory statements—the "trashy" reference—and conclude, as a matter of federal constitutional law, that it cannot support a recovery. We then address the second statement—"20 minutes on hold"—and conclude that it is actionable. We move at that point to the matter of public concern (but do not resolve it). Finally, because a new trial is required, we offer some guidance to the district court in connection with the role of negligence in Maine defamation cases.

## III. STAPLES: THE FIRST AMENDMENT AND STATE DEFAMATION LAW

For many years, states enacted statutes and applied common law tort principles in the area of defamation with no more than a passing nod to the First Amendment's free speech guaranty. This era of constitutional non-interference ended when the Justices proclaimed "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times,* 376 U.S. at 270, 84 S.Ct. at 721. Faithful to this ideal, the Court announced that the First Amendment pre-

---

1. Among other things, the district court ruled that other statements which Olson had uttered were not actionable and pretermitted various causes of action. These matters are not within the compass of this appeal and we make no further mention of them.

cludes recovery by a public official under state defamation law unless the official shows that the speaker acted with actual malice, that is, with knowledge of or reckless disregard for the falsity of the statement. *See id.* at 279–80, 84 S.Ct. at 725–26.

The seeds sown in *New York Times* have blossomed over the years, giving rise to a crop of checks on the sweep of state defamation law. We harvest four points.

### A. *Independent Appellate Review.*

■ First, the deference traditionally shown by courts toward factfinders' determinations is muted when defamation issues implicate free speech concerns. In such circumstances, appellate judges must conduct a whole-record review and "examine for [them]selves the statements in issue and the circumstances under which they were made to see … whether they are of a character which the principles of the First Amendment" protect. *Id.* at 285, 84 S.Ct. at 728–29 (citation and internal quotation marks omitted). This requirement of independent appellate review is not a procedural directive, but, rather, "a rule of federal constitutional law" that "reflects a deeply held conviction that judges … must exercise such review in order to preserve the precious liberties established and ordained by the Constitution." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510–11, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984). Indeed, when the imperative of independent review conflicts with a standard procedural dictate (such as Fed.R.Civ.P. 52(a)), the constitutional mandate controls. *See id.* at 514, 104 S.Ct. at 1967.

■ As a practical matter, this requirement means that federal courts engage in de novo review when mulling defamation issues that are tinged with constitutional implications. *See, e.g., id.* at 511, 514, 104 S.Ct. at 1965, 1967; *Connick v. Myers,* 461 U.S. 138, 147–48 & n. 7, 103 S.Ct. 1684, 1690–91 & n. 7, 75 L.Ed.2d 708 (1983); *Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724, 727 (1st Cir.1992); *Kassel v. Gannett Co.,* 875 F.2d 935, 937 (1st Cir.1989). Maine courts follow the same course. *See Rippett v. Bemis,* 672 A.2d 82, 86 (Me.1996); *Caron v. Bangor Publishing Co.,* 470 A.2d 782, 784 (Me. 1984).

### B. *Opinions May Be Actionable.*

■ The First Amendment does not inoculate all opinions against the ravages of defamation suits. A statement couched as an opinion that presents or implies the existence of facts which are capable of being proven true or false can be actionable. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18–19, 110 S.Ct. 2695, 2705–06, 111 L.Ed.2d 1 (1990); *see also* Restatement (Second) of Torts § 566 (1977) ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.").[2] Thus, a statement normally is not actionable unless it contains an objectively verifiable assertion.[3] Chief Judge Posner has captured the distinction between statements that are actionable and those that are not:

> A statement of fact is not shielded from an action for defamation by being prefaced with the words 'in my opinion,' but if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.

---

**2.** Restatement § 566 seemingly applies the *Milkovich* standard to defamation actions regardless of whether the challenged statements address issues of public or private concern. This formulation accurately reflects Maine's defamation law. *See, e.g., Staples v. Bangor Hydro–Elec. Co.,* 629 A.2d 601, 603 (Me.1993); *Lightfoot v. Matthews,* 587 A.2d 462, 462 (Me.1991).

**3.** The *Milkovich* Court explained: "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth," and the comment can be actionable. 497 U.S. at 18, 110 S.Ct. at 2705–06. By contrast, if the speaker says, "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin," the First Amendment bars recovery because the statement cannot be objectively verified. *Id.* at 20, 110 S.Ct. at 2706.

*Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir.1993).

■ The *Milkovich* Court was careful not to discard the baby with the bath water: while leaving some statements of opinion exposed, the Court reaffirmed the protection long afforded to "imaginative expression" and "rhetorical hyperbole." 497 U.S. at 17, 20, 110 S.Ct. at 2704–05, 2706–07. Thus, the First Amendment prohibits defamation actions based on loose, figurative language that no reasonable person would believe presented facts. *See, e.g., Letter Carriers v. Austin,* 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781–82, 41 L.Ed.2d 745 (1974) (holding that use of the word "traitor" to define a worker who crossed a picket line was not actionable); *Greenbelt Co-op. Publishing Ass'n v. Bresler,* 398 U.S. 6, 13–14, 90 S.Ct. 1537, 1541–42, 26 L.Ed.2d 6 (1970) (holding that a newspaper's characterization of a developer's negotiating position as "blackmail" was not defamatory; the word was simply an epithet and, under the circumstances, did not suggest commission of a crime); *Phantom Touring,* 953 F.2d at 728 (calling a play "a rip-off, a fraud, a scandal, a snake-oil job" was mere hyperbole and, thus, constitutionally protected).

■ The First Amendment's shielding of figurative language reflects the reality that exaggeration and non-literal commentary have become an integral part of social discourse. For better or worse, our society has long since passed the stage at which the use of the word "bastard" would occasion an investigation into the target's lineage or the cry "you pig" would prompt a probe for a porcine pedigree. Hyperbole is very much the coin of the modern realm. In extending full constitutional protection to this category of speech, the *Milkovich* Court recognized the need to segregate casually used words, no matter how tastelessly couched, from fact-based accusations.

4. It is unclear whether the First Amendment prohibits a state from imposing strict liability in a defamation case brought by a private plaintiff concerning statements that implicate a matter of private concern. *See Snead v. Redland Aggregates, Ltd.,* 998 F.2d 1325, 1334 (5th Cir.1993)

## C. *Actual Malice Sometimes Must Be Shown.*

■ The Supreme Court has ruled that the First Amendment not only restricts the types of actionable statements, but also limits the kinds of recoverable damages. Of particular relevance here is the Court's holding that a private individual who seeks damages for a defamatory statement involving a matter of public concern cannot recover presumed or punitive damages absent a showing of actual malice. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 751, 756–57, 105 S.Ct. 2939, 2941, 2943–44, 86 L.Ed.2d 593 (1985); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789 (1974). Determining whether an allegedly defamatory statement involves a matter of public concern requires a court to assess the statement's "content, form and context . . . as revealed by the whole record." *Dun & Bradstreet,* 472 U.S. at 761, 105 S.Ct. at 2946 (quoting *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690). Withal, locating particular statements along the public/private continuum is sometimes a surpassingly difficult task.

## D. *Fault Always Must Be Shown.*

■ The fourth principle that must be understood before we embark on our odyssey through the record is a restriction on defamation that Maine's jurisprudence hallows, though its constitutional credentials remain inscrutable.[4] Simply put, Maine defamation law does not recognize liability without fault; rather, as a predicate to recovery, Maine requires a defamation plaintiff to show that the defendant acted at least negligently. *See Lester v. Powers,* 596 A.2d 65, 69 (Me.1991).

## IV. THE NATURE OF THE STATEMENTS

The two statements that the district court permitted the jury to consider are not in legal equipoise. Hence, we discuss them separately.

(discussing the question and concluding that the First Amendment "imposes no minimum standard of fault in private/private libel cases"). Because Maine has articulated a minimum negligence standard for all defamation actions, we need not ponder the constitutional issue here.

## A. *Talking Trash.*

■ The district court ruled that the adjective "trashy" stated an opinion that implied a provably false fact and was, therefore, actionable. This ruling rested on the court's expressed view that the term had a single, readily ascertainable meaning—"dirty or unkempt"—and that, in Judge Carter's words, Olson's statement could be "verified or disproved through straightforward inquiry into the condition of [Levinsky's] store's physical appearance." We do not agree.

■ Despite avowals that all speech is infinitely malleable, *see, e.g.,* Lewis Carroll, *Through the Looking Glass,* ch. 6 (1872) (reporting Humpty Dumpty's declaration: "When I use a word, it means just what I choose it to mean—neither more nor less."), the First Amendment does not allow courts the luxury of a deconstructionist approach to language. Some words or phrases evoke a multiplicity of meanings; others do not. Under the aegis of the First Amendment, a particular word or phrase ordinarily cannot be defamatory unless in a given context it reasonably can be understood as having an easily ascertainable and objectively verifiable meaning. The vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be actionable. *See, e.g., Phantom Touring,* 953 F.2d at 728 (holding that newspaper articles that referred to the plaintiff's production of "The Phantom of the Opera" as "fake" and "phony" were not actionable because the descriptions were "unprovable," inasmuch as "those adjectives admit of numerous interpretations"); *McCabe v. Rattiner,* 814 F.2d 839, 842–43 (1st Cir. 1987) (holding that a newspaper headline which referred to the plaintiff's real estate development as a "scam" was not actionable because the word means different things to different people and "[t]he lack of precision makes the assertion 'X is a scam' incapable of being proven true of false").

It is against this mise-en-scène that we must explore the meaning of the word "trashy." We start, as we often do in searching out the meaning of a word, with the dictionary. Lexicographic sources do not reflect any specific meaning of the word. *See, e.g., Webster's Third New International Dic-*tionary 2432 (1986) (defining "trashy" as "resembling or containing trash: of inferior quality: worthless ... covered or strewn with dried or withered vegetable matter"); 20 *Oxford English Dictionary* 440 (2d ed.1989) (defining "trashy" as "[o]f the nature of trash; rubbishy; worthless .... [e]ncumbered with trash, that is, with the withered growth of the previous season"); *The American Heritage Dictionary of the English Language* 1904 (3d ed.1992) (defining "trashy" as "[r]esembling or containing trash; cheap or worthless ... [i]n very poor taste or of very poor quality").

Going beyond the lexicon, an impromptu survey of the case law confirms that the word has been used to convey many different meanings. *See, e.g., Giano v. Senkowski,* 54 F.3d 1050, 1058 (2d Cir.1995) (Calabresi, J., dissenting) (describing erotic magazines as "trashy"); *Johnson v. City of Pleasanton,* 781 F.Supp. 632, 638 (N.D.Cal.1991) (using the word to denote inferior physical appearance; commenting that satellite antennas make a building look "trashy"), *aff'd in part,* 982 F.2d 350 (9th Cir.1992); *Christy v. Servitto,* 699 F.Supp. 618, 625 (E.D.Mich.1988) (quoting attorney's description of a presumably disreputable woman as "flashy trashy"), *aff'd,* 932 F.2d 502 (6th Cir.1991).

Literary sources also illustrate the variations in meaning associated with the word "trashy." For example, Jeremiah Dyke employed the term's "inferior quality" meaning when he spoke of "[s]uch solvenly meat, such trashy meat, such bitter meat." Jeremiah Dyke, *Divers Select Sermons* (1640). An English author preferred its "prurient interest" connotation when she complained of reading "the trashiest heap of novels." Jane Welsh Carlyle, *Letters and Memorials* (1883). Edmund Wilson found the "lacking worth" meaning useful when he described Rudyard Kipling's *Stalky & Company* as "crude in writing [and] trashy in feeling." Edmund Wilson, *The Wound and the Bow* 114 (1941). Louis Bromfield showed a more traditionalist bent, favoring the classic "covered with withered growth" meaning of the word when he wrote of a seedbed that "was rough and trashy." Louis Bromfield, *Pleasant Valley* 174 (1945). While these four il-

lustrations merely scratch the surface, they amply demonstrate the term's definitional flexibility.

The usages paraded through the courtroom by Levinsky's able counsel reinforce this point. Particularly revelatory are his opening and closing statements, in which he seemed frankly to acknowledge the word's many connotations. At various times, counsel suggested to the jury that Olson's statement referred to the manner in which the plaintiff maintained its stores (in this context meaning "filthy" and "dirty"), to the merchandise that the plaintiff purveyed (in this context meaning "inferior" and "crappy"), and to the character of the persons associated with the enterprise (in this context meaning "sleazy" and "untrustworthy").[5] This broadcast acknowledgement that the word "trashy" possesses a multitude of fairly ascribable meanings is in itself telling.[6]

In this instance, moreover, the inherent elusiveness of "trashy" is not pinned down by context. Indeed, the imprecision of the word is accentuated by the testimony of the journalist, Boardman, who, when asked his understanding of "trashy" as Olson had voiced it, responded, "It's always been hard for me to define exactly what he was referring to." In the same vein, Boardman reported that Olson's only amplification of the remark was that "customers should pay a little more money to buy the same item they want somewhere else." Like "trashy" itself, this comment presents a moving target.

The polysemous nature of the word "trashy" dooms Levinsky's effort to recover for Olson's use of it. The word "trashy" is a chameleon that continuously changes colors and shades of meaning. It admits of numerous interpretations. We can imagine no objective evidence that might conclusively

prove or disprove it. Like the equally pejorative terms used in *Phantom Touring* ("fake," "phony," "rip-off"), *McCabe* ("scam"), and *Dilworth v. Dudley*, 75 F.3d 307, 310–11 (7th Cir.1996) (allowing no defamation remedy when one scholar calls another a "crank"), "trashy" is quintessentially subjective.

To say more about this point would be supererogatory. Branding a store, its merchandise, its customers, or its proprietors as "trashy" is uncomplimentary, and it may be unwarranted; in the last analysis, however, such a comment is loose language that cannot be objectively verified. Consequently, it belongs squarely in the category of protected opinion. It follows inexorably that Levinsky's reliance on this unflattering adjective to underpin a defamation claim offends the First Amendment. *See Milkovich*, 497 U.S. at 20–21, 110 S.Ct. at 2706–07; *Washington v. Smith*, 80 F.3d 555, 556–57 (D.C.Cir.1996); *Phantom Touring*, 953 F.2d at 728; *McCabe*, 814 F.2d at 842–43; *see also Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1016 (1st Cir.1988).

### B. *On Hold.*

The district court likewise ruled that Olson's second statement (when calling Levinsky's, "you are sometimes put on hold for 20 minutes—or the phone is never picked up at all") encompassed matters of fact (or opinions that implied provably false facts) and was, therefore, actionable. Wal–Mart takes exception to this ruling. Its principal argument is that constitutional shelter for this statement can be found in the First Amendment protections typically afforded figurative language and hyperbole.[7] We think not.

Certain excesses of language cannot ground a defamation claim because, *in con-*

---

5. These iterations, including the adjectives quoted in the parenthetical inserts, appear at pages 22–23 (opening statement) and 273–274 (closing statement) of the trial transcript.

6. Following the district court's lead, Levinsky's counsel now seeks to define "trashy" solely with reference to lack of cleanliness. We give this tergiversation short shrift. Those who sue for defamation are not at liberty to pick and choose among a word's various possible definitions and saddle the speaker with the consequences.

7. Wal–Mart's other arguments on this point can be dismissed out of hand. In this wise, we note that the record contains no evidence from which a jury supportably could find that this comment was literally true. At trial, Olson testified that on three separate occasions he had called Levinsky's and had been put on hold *for a total of 20 minutes or more* (but no longer than 10 minutes on any one occasion). The appellant adduced no other evidence suggesting that Olson's statement was accurate.

*text,* those excesses involve only puffery or epithets, and thus are insufficiently fact-based. *See, e.g., Austin,* 418 U.S. at 284–86, 94 S.Ct. at 2781–82 ("traitor"); *Bresler,* 398 U.S. at 13–14, 90 S.Ct. at 1541–42 ("blackmail"). These turns of phrase are recognized rhetorical devices; they are not actionable because they are commonly understood, in context, as imaginative expressions rather than statements of fact.

Paddling furiously to reach this safe harbor, the appellant urges us to interpret Olson's comment as an obvious exaggeration, tantamount to the statement "you are sometimes put on hold forever." No reasonable listener, the appellant asseverates, would consider this variant an assertion of literal truth. But the appellant's argument requires a leap of faith that we are unwilling to essay. The First Amendment does not allow courts to distort the reality of events under the guise of protecting freedom of expression. Thus, a reviewing court must evaluate a speaker's statement as it was given and must resist the temptation to replace what was actually said with some more innocuous alternative.

■ The determination of whether a statement is hyperbole depends primarily upon whether a reasonable person could interpret the statement to provide actual facts about the individual or institution it describes. *See Milkovich,* 497 U.S. at 20, 110 S.Ct. at 2706–07; *cf. Hustler Magazine v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988) (precluding recovery on the ground that an advertising parody, which claimed that a minister had lost his virginity in a drunken rendezvous with his mother, was incredible). Under this criterion, the "20 minutes" statement seems sufficiently factual to be proved true or false. For one thing, Olson's use of a specific time frame cuts against treating his remark as hyperbole or other non-factual speech. For another thing, the assertion can be verified or rebutted by objective evidence of how Levinsky's staff handled telephone calls (evidence of the

type that, in fact, Levinsky's adduced and the jury heard). In addition, the statement is not inherently implausible. Especially given the pervasive folklore concerning the difficulties that consumers encounter in dealing with merchants telephonically, we believe that a reasonable listener could interpret the "20 minutes" comment as a statement of fact about Levinsky's business practices.

As the appellant correctly notes, we cannot take the "20 minutes" remark in isolation. Seizing this potential lifeline, Wal–Mart struggles to persuade us that the second part of Olson's statement—"the phone is never picked up at all"—colors the context and makes it plain that he was speaking figuratively. Though context is an important aspect of the *Milkovich* inquiry, *see Phantom Touring,* 953 F.2d at 727; *McCabe,* 814 F.2d at 842–43, it does not aid the appellant here. While the second portion of Olson's statement does not incorporate a fixed temporal interval, that remark, when read in tandem with the first portion of the statement, does not defuse the defamatory potential. A reasonable listener could well conclude that Levinsky's service was so bad that the company not only left customers dangling on the line for 20 minutes at a crack, but also, on some occasions, simply did not bother to answer the telephone.

In fine, the overall context does little to dispel the impression that Olson's comment stated facts about Levinsky's business practices. After all, Levinsky's and Wal–Mart were locked in hand-to-hand combat for shoppers' dollars, and Olson held an executive position with Wal–Mart. While a reasonable listener might be skeptical given Olson's likely motive (to try to lure potential customers to his store), he gave his assertion a particularized factual component. A listener reasonably could conclude that Olson intended to describe from personal knowledge how Levinsky's treated callers.[8]

The short of it is that neither the type of language employed nor the overall tenor of the article negated the reasonable impression

---

8. Olson did not furnish Boardman, and Boardman did not print, any factual predicate for the assertions. This distinguishes them from certain comments discussed in *Phantom Touring,* 953

F.2d at 729, where context made it unmistakably clear that the challenged speech, though superficially capable of being proved true or false, represented only a point of view.

that Olson steadfastly maintained that Levinsky's telephone practices were in fact as he described them to be. On this basis, the "20 minutes" statement properly could be treated as fact-based defamation. So viewed, the statement does not fit within the contours of protected speech, and it was, as the lower court concluded, amenable to suit under the *Milkovich* regime.

## V. PUBLIC CONCERN

■ Even though the "20 minutes" statement is actionable, the appellant has another defense in stock. The jury awarded only presumed damages, and the Constitution forbids an award of presumed or punitive damages for words spoken without actual malice on matters of public concern. *See Dun & Bradstreet*, 472 U.S. at 756, 105 S.Ct. at 2943–44. Wal–Mart contends that this is such a case.[9]

■ The Supreme Court has roughly bisected the sphere of social commentary between matters of public concern, which are those that can be "fairly considered as relating to any matter of political, social, or other concern to the community," and matters of private concern, which are those that address "matters only of personal interest." *Connick*, 461 U.S. at 146–47, 103 S.Ct. at 1690. A court must determine whether a statement comes within the public concern hemisphere of this formulation by reference to its "content, form and context." *Dun & Bradstreet*, 472 U.S. at 761, 105 S.Ct. at 2946. In order to do so, the relevant community need not be very large and the relevant concern need not be of paramount importance or national scope. Rather, "it is sufficient that the speech concern matters in which even a relatively small segment of the general public might be interested." *Roe v. City of San Francisco*, 109 F.3d 578, 585 (9th Cir.1997).

When called upon to perform a public concern analysis, courts have found the *Connick* line of cases, i.e., judicial decisions involving public employees fired for making comments that arguably relate to matters of public concern, to be instructive. The Supreme Court has approved this analogy, *see Dun & Bradstreet*, 472 U.S. at 759, 105 S.Ct. at 2945, and we encourage its use. Still, jurists and lawyers alike should employ it with a caveat in mind. Public employee cases typically involve speech on matters relating to public sector jobs, and criticism of the workings of government is at the core of conduct protected by the First Amendment. *See New York Times*, 376 U.S. at 282–83, 292, 84 S.Ct. at 727–28, 732–33. Statements that implicate issues outside the public sector may require more rigorous analysis.

In this case, the appellant argues that the "20 minutes" statement related to a matter of public concern because *Biz* published it in an article describing the "David versus Goliath" battle between Wal–Mart and a local, family-owned business. To bolster this argument, Wal–Mart points out that Boardman decided to write the piece because this type of business struggle had sparked intense interest across the country and because Levinsky's radio advertisements had called attention to a local microcosm of this struggle. Levinsky's counters by characterizing the comments as statements made in the course of a dispute between two private businesses. The mere fact that the competition between the two merchants interested a journalist, Levinsky's posits, does not make the matter one of public concern.

The district court decided this issue in Levinsky's favor, but based its decision entirely on Olson's testimony that he thought he was engaged in a private conversation with a college student. This prop is very shaky. Passing the probability that the prop is constructed from less than sturdy factual material—Olson's query to Boardman ("You're not going to use my name, are you?") suggests that at some point he did realize that Boardman would convey his comments to a wider audience—we do not think that a speaker's subjective belief as to who will hear his statements should be the sole determinant of the constitutional question.

---

9. Levinsky's assertion that Wal–Mart waived the right to raise the public concern issue is meritless. The opinions of the magistrate judge and the district judge in this case show beyond any peradventure of doubt that Wal–Mart consistently pressed the public concern argument in the proceedings below, and the trial transcript confirms that fact.

To be sure, we have recognized that in some circumstances a private statement might not qualify "on the basis of its content alone, as a matter of inherent public concern," and that a court therefore may consider the speaker's "subjective intent to contribute to any ... public discourse." *O'Connor v. Steeves,* 994 F.2d 905, 914 (1st Cir.1993). Yet the Supreme Court has made it pellucid that the First Amendment protects comments privately expressed, *see Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979), and that private statements can touch on matters of public concern, *see Rankin v. McPherson,* 483 U.S. 378, 386 & n. 11, 107 S.Ct. 2891, 2897–98 & n. 11, 97 L.Ed.2d 315 (1987). It is thus apparent that the speaker's intent is only one of a constellation of relevant factors implicated by a whole-record review of the speech's form, content, and context. *See Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91; *O'Connor,* 994 F.2d at 914 & n. 5. The primary focus of the relevant constitutional inquiry must remain on the speech's content and the public's perception of the topic, not on the speaker's subjective belief as to the conversation's confidentiality.

We are confronted, then, with a situation in which the lower court's resolution of the public concern issue is undermined by its incomplete assessment of the form, content, and context of Olson's statements. That sort of disconnect is invariably a problem for an appellate court. Here, however, the problem is exacerbated in two ways.

First, if we proceed on the record as it stands, we will be compelled to resolve an unsettled question as to what sources an appellate court may consult in attempting to ascertain whether a statement relates to a matter of public concern. Of course, certain things are clear. We know, for example, that Levinsky's decision to sue Wal–Mart does not retroactively confer public concern status on Olson's statements. To the contrary, media coverage of the lawsuit itself is irrelevant

on this issue. *See Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 591 (1st Cir.1980); *cf. Hutchinson v. Proxmire,* 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979) ("[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."). We know, too, that Levinsky's radio advertisements, Boardman's interest in the issue, and the *Biz* article, all of which are of record here, constitute relevant evidence that may help to determine public versus private concern by clarifying the context in which Olson spoke. *See Rankin,* 483 U.S. at 381–86, 107 S.Ct. at 2895–98 (examining contextual evidence to determine whether a challenged statement dealt with a matter of public concern). But the record contains little else that bears on the public concern issue.

Equally as vexing, the appellant has asked us to take notice of a substantial body of information—newspaper and magazine articles, excerpts from congressional hearings, and the like—that could have been, but was not, presented below. It is uncertain whether we may honor the appellant's request, *see Matthews v. Marsh,* 755 F.2d 182, 183 (1st Cir.1985); *United States v. Kobrosky,* 711 F.2d 449, 456 (1st Cir.1983); *Rosen v. Lawson–Hemphill, Inc.,* 549 F.2d 205, 206 (1st Cir.1976), and, if so, whether we should exercise that right.

The second complicating factor is that the public concern issue is intertwined with the question of actual malice. *See supra* Part III(C). Accordingly, even if the "20 minutes" statement involved a matter of public concern, an award of presumed damages would be constitutionally acceptable as long as the statement had been made with actual malice. In itself, this interrelation between public concern and actual malice is standard fare. Here, however, the district court did not resolve the actual malice question, either by submitting it to the jury or otherwise, because it had ruled against Wal–Mart on the public concern issue.[10]

---

**10.** To be sure, the jury did find specially that Olson spoke without common law malice (ill will or spite). Notwithstanding the similarity in nomenclature, however, common law malice and

actual malice are not identical. *See Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510–11, 111 S.Ct. 2419, 2429–30, 115 L.Ed.2d 447 (1991) (discussing the distinction).

■ These complications counsel in favor of judicial restraint. Although we have the authority to resolve public concern issues *ab initio* at the appellate level, *see Connick,* 461 U.S. at 147–48 & n. 7, 103 S.Ct. at 1690–91 & n. 7, we choose not to exercise that authority in this situation. We do not have the benefit of a reliable district court decision on the public concern issue; the record is very sparsely developed in regard to that issue; what evidence there is does not suggest a clear answer to whether or not Olson spoke on a matter of public concern; there is a substantial body of relevant evidence that was never presented below; and the existence *vel non* of actual malice remains problematic. Rather than groping for an answer to the question under the combined weight of these handicapping circumstances, we think that it would be fairest, all around, to remand and give the parties (not to mention the district court) a full opportunity to explore all aspects of this issue. *See Penobscot Indian Nation v. Key Bank,* 112 F.3d 538, 561–62 (1st Cir.1997) (refusing to determine, as a matter of law, "public figure" status in a defamation action when presented with insufficient record evidence), *cert. denied,* —— U.S. ——, 118 S.Ct. 297, —— L.Ed.2d —— (1997); *cf. Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986).

## VI. NEGLIGENCE

■ Over Wal–Mart's objection, the court below submitted multiple defamation claims ("trashy" and "20 minutes") to the jury, which returned only a general verdict. That verdict may have been based, in whole or in part, on the improvidently submitted ("trashy") claim. Where such a contretemps occurs and a reviewing court cannot identify which of the two claims—one proper and one improper—the jury relied upon to reach the general verdict, the usual rule is that the verdict must be vacated. *See Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.,* 370 U.S. 19, 30, 82 S.Ct. 1130, 1136, 8 L.Ed.2d 305 (1962); *Lattimore v. Polaroid Corp.,* 99 F.3d 456, 468 (1st Cir.1996). So it is here. Thus, we must remand for a new trial.

In other circumstances, this conclusion might end the appellate task. Here, however, the negligence issue persists: Wal–Mart assigns error to the district court's refusal to instruct the jury that the plaintiff had to show some fault on the defendant's part to recover, and this issue is likely to arise on retrial. Consequently, we tackle it here.

■ Levinsky's tries to head off this inquiry altogether. It asserts that any instructional error was a postmortem wound inflicted after Wal–Mart had committed legal suicide both by failing to contest Olson's negligence during the trial and by admitting negligence in its closing argument. The nisi prius roll does not verify this autopsy report.

The record clearly shows that Wal–Mart contested negligence at all times. Throughout the trial, it endeavored to demonstrate that Olson's comments were not culpable, but, rather, were reasonably based on his personal observation of conditions at Levinsky's stores. By the same token, Levinsky's charge that Wal–Mart's trial counsel conceded negligence reads too much into too little.

■ Specifically, Levinsky's points to the acknowledgement, repeated twice in the course of Wal–Mart's summation, that Olson "made a mistake." Certainly, an admission of counsel during trial is binding on the client. *See Oscanyan v. Arms Co.,* 103 U.S. (13 Otto) 261, 263–64, 26 L.Ed. 539 (1880). To qualify as an admission, though, counsel's statement, when taken in context, must be clear and unambiguous. *See MacDonald v. General Motors Corp.,* 110 F.3d 337, 340 (6th Cir.1997); *United States v. Insurance Co. of N. Am.,* 83 F.3d 1507, 1511 n. 6 (D.C.Cir. 1996); *Schott Motorcycle Supply, Inc. v. American Honda Motor Co.,* 976 F.2d 58, 61 (1st Cir.1992).

Here, counsel's statement that Olson "made a mistake" falls measurably short of this benchmark. In its most natural iteration, the remark can be understood as referring to Olson's breach of his company's media communications policy. Disregarding company policy is risky—but it may or may not be negligent. Few would doubt that if Olson could go back in time and exercise his

option to stand mute in the face of Boardman's interrogation, he would do so. Characterizing Olson's conduct as a mistake, then, probably had little to do with the issue of negligence. In all events, it strains credulity to label counsel's description of Olson's actions as a clear, unambiguous admission that those actions satisfied the legal standard of fault. Consequently, we reach the merits of the jury instruction claim.

 We review challenges to jury instructions with a focus on whether the instructions "adequately illuminate the law applicable to the controlling issues in the case without unduly complicating matters or misleading the jury." *United States v. DeStefano,* 59 F.3d 1, 3 (1st Cir.1995). An erroneous instruction requires a new trial if the preserved error, based on a review of the entire record, can fairly be said to have prejudiced the objecting party. *See United States v. Taylor,* 54 F.3d 967, 976 (1st Cir.1995).

In this instance, Wal–Mart requested a jury instruction on negligence, but the trial judge denied the request and charged the jury on the elements of defamation without mentioning fault. Wal–Mart interposed a timely and legally sufficient objection. *See* Fed.R.Civ.P. 51.

 The trial judge made his position very clear. He reasoned that the doctrine of defamation per se applied, and that, because malice is implied in cases of defamation per se, a negligence instruction would be pointless. We agree with the court's premise but not with its conclusion.

As we explained earlier, *see supra* Part III(D), Maine law does not recognize liability without fault in defamation cases. Contrary to the district court's view, Maine's allegiance to the doctrine of defamation per se does not alter this rule. That doctrine is relevant to damages, not to liability. Under it, claimants in certain defamation cases need not prove actual damages as a prerequisite to recovery. *See Rippett,* 672 A.2d at 86 (applying the doctrine when the defendant's statement adversely reflects on the plaintiff's business); *Ramirez v. Rogers,* 540 A.2d 475, 478 (Me. 1988) (applying the doctrine when the defen-

dant's statement implies a false charge of criminal conduct).

It is true, of course, that Maine's Supreme Judicial Court has held that "malice is implied as a matter of law in [defamation per se] cases." *Saunders v. Van Pelt,* 497 A.2d 1121, 1124–25 (Me.1985). In one sense, that declaration might make it seem that the doctrine relieves such a plaintiff of any burden to show fault. But as this case proves, appearances are sometimes deceiving.

 Common law malice refers only to state of mind, specifically, ill will or spite. *See Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510–11, 111 S.Ct. 2419, 2429–30, 115 L.Ed.2d 447 (1991); *Lester,* 596 A.2d at 70 n. 8. The concept does not incorporate, and thus cannot subsume, any fault standard. This is in sharp contradistinction to actual malice, as that term is defined in the vocabulary of the First Amendment. Actual malice does incorporate a fault standard—"knowledge that [a statement] was false or ... reckless disregard [as to] whether it was false or not." *Masson,* 501 U.S. at 510, 111 S.Ct. at 2429 (quoting *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 726). Maine's defamation per se doctrine contemplates the common law, rather than the constitutional, brand of malice. *See Michaud v. Inhabitants of Livermore Falls,* 381 A.2d 1110, 1113 (Me.1978). Hence, it is not a proxy for the showing of fault that state defamation law unambiguously requires.

A recent deployment of the defamation per se doctrine by Maine's highest court dispels any doubt on this score. In *Rippett,* the trial court granted summary judgment against a plaintiff who claimed defamation per se because the police had made statements that falsely charged her with criminal activity. 672 A.2d at 84–86. The Maine Supreme Judicial Court reversed, holding that the plaintiff had adduced sufficient evidence that the defendants had made defamatory statements "on the basis of an investigation so flawed as to constitute at least negligence." *Id.* 672 A.2d at 86. This holding effectively reaffirmed Maine's requirement that a negligence element must exist in all defamation cases; if defamation per se obviated the need

to show fault, the *Rippett* court's discussion of negligence would have been superfluous.

Accordingly, the court below erred in failing to instruct the jury on Maine's negligence requirement in defamation actions. At a subsequent trial, the district court should tender such an instruction.

## VI. CONCLUSION

We need go no further. Common sense suggests (and the record shows) that Olson's comments were intemperate. Still, the statement that something (a Levinsky's store, or its contents, or its owner) was "trashy" cannot be objectively verified and thus is not actionable in a defamation suit. That error poisons the general verdict, even though Olson's other statement—"20 minutes on hold"—is fit for jury consumption. Consequently, the general verdict must be set aside and the case remanded for a new trial, subject, however, to whatever resolution the lower court may make in regard to whether Olson's comments implicated a matter of public concern, and if so, whether the evidence is sufficient to show actual malice. If a new trial transpires, the jury should be instructed, inter alia, on the element of negligence under Maine defamation law.

*Reversed and remanded.*