# United States Court of Appeals
## For the First Circuit

No. 01-2443

JOHN GARRETT,

Plaintiff, Appellant,

v.

TANDY CORPORATION D/B/A RADIO SHACK,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Chief Judge,

Bownes, Senior Circuit Judge,

and Selya, Circuit Judge.

Jeffrey Neil Young, with whom James G. Fongemie and McTeague, Higbee, Case, Cohen, Whitney & Toker, P.A. were on brief, for appellant.

Melinda J. Caterine, with whom Jonathan Shapiro and Moon, Moss, McGill, Hayes & Shapiro, P.A. were on brief, for appellee.

July 9, 2002

**SELYA**, **Circuit Judge**.  In this case, plaintiff-appellant John Garrett, a black man, alleges that he was the object of both racial discrimination and slander during and after a shopping trip to a Radio Shack store.  The district court dismissed the case in its entirety.  We affirm the dismissal of the appellant's race-discrimination claim but reverse as to his defamation claim.

## I.  BACKGROUND

This appeal stands or falls on the facts alleged in the amended complaint.  SEC v. SG Ltd., 265 F.3d 42, 46 (1st Cir. 2001) (limning decisional framework applicable to motions to dismiss for failure to state a claim); LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 508 (1st Cir. 1998) (same).  For present purposes, therefore, we take those facts as true even though the defendant, as the case progresses, may deny some or all of them.  We then recount the travel of the case.

### A.  Facts Alleged in the Amended Complaint.

On December 21, 1998, the appellant entered a Radio Shack store in Brunswick, Maine, seeking to purchase a police scanner.  For the duration of his stay, he was the only African-American on the premises.  Three employees — all of whom were white — monitored his movements, and at least one of them accompanied him throughout his visit.  Upon inquiry, a clerk told the appellant that the scanner he wished to buy was not in stock.  The appellant did find a book, a telephone, and some batteries that were to his liking.

-2-

At the checkout counter, he bought those items and asked whether the scanner might be available at another branch. After calling around, the store manager, Steven Richard, responded in the negative. At that juncture, Richard requested the appellant's name and address. The appellant obliged.

Soon after the appellant left, Richard discovered that a laptop computer worth approximately $2,000 was missing. Richard reported the purloined computer to the Brunswick police, told them that he suspected the appellant of the theft, and supplied the officers with the appellant's address. The appellant lived in the nearby town of Bath, and the Brunswick police contacted their counterparts in that community. A Bath police officer thereafter went to the appellant's home to investigate the reported theft. The appellant allowed the officer to search his dwelling and his car, but the officer found no trace of the stolen computer.

After the officer left, the appellant telephoned Radio Shack to complain about what he believed to be unjust and racially discriminatory treatment. Richard told him that all the customers who were in the store during the same time frame had been reported as suspects in the theft. This statement was patently false; Richard did not provide information about any other persons (including the three or four white customers who had purchased items at about the same time) to the authorities. Indeed, apart

from transmitting the appellant's identity to the police, Radio Shack made no effort to locate the wayward computer.

The appellant heard nothing further from the police. Although he became dissatisfied with some of the products that he had purchased, he did not try to return them for fear that he would again be accused of shoplifting.

## B. **Travel of the Case**.

On April 22, 1999, the appellant filed an administrative complaint with the Maine Human Rights Commission (MHRC), charging Radio Shack with discrimination in a public accommodation. See Me. Rev. Stat. Ann. tit. 5, § 4612. On January 27, 2000, the MHRC concluded that reasonable grounds existed to believe that unlawful discrimination had occurred and issued a right-to-sue letter. The appellant eschewed further state proceedings and brought suit in the federal district court. His complaint premised federal jurisdiction both on the existence of a federal question, see 28 U.S.C. § 1331, and on diversity of citizenship, see id. § 1332(a). As amended, the body of the complaint contained three statements of claim. The first asserted violations of 42 U.S.C. §§ 1981 and 1982 (count 1). The second asserted a violation of the Maine Human Rights Act (MHRA), Me. Rev. Stat. Ann. tit. 5, § 4613(2)(B) (count 2). The third asserted a claim for defamation (count 3).

Radio Shack moved to dismiss the amended complaint for failure to state a claim upon which relief could be granted. See

Fed. R. Civ. P. 12(b)(6). After briefing and argument, the district court granted the motion with respect to the first and third counts. Garrett v. Tandy Corp., 142 F. Supp. 2d 117, 121 (D. Me. 2001). The court allowed the MHRA claim to proceed, id., but later dismissed it without prejudice, presumably for failure to satisfy the amount in controversy required for the existence of diversity jurisdiction. See Garrett v. Tandy Corp., No. 00-384 (D. Me. Sept. 17, 2001) (unpublished order); see also 28 U.S.C. § 1332(a) (establishing jurisdictional minimum of more than $75,000 for diversity cases); Me. Rev. Stat. Ann. tit. 5, § 4613(2)(B)(7) (capping civil penalties under the MHRA at $10,000 for a first violation). This timely appeal followed.

## II. ANALYSIS

We review the allowance of a motion to dismiss de novo, taking as true the well-pleaded facts contained in the complaint and drawing all reasonable inferences therefrom in the plaintiff's favor. Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999); LaChapelle, 142 F.3d at 508. In so doing, however, we "eschew any reliance on bald assertions, unsupportable conclusions, and opprobrious epithets." Chongris v. Bd. of Appeals, 811 F.2d 36, 37 (1st Cir. 1987) (citation and internal quotation marks omitted). Only if the complaint, read in this plaintiff-friendly fashion, presents a scenario that precludes recovery on any viable theory

-5-

may we affirm an order of dismissal.  See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); LaChapelle, 142 F.3d at 508.

In this venue, the appellant challenges the district court's dismissal of counts 1 and 3.  We examine each count separately.

## A.  Racial Discrimination.

Count 1 of the amended complaint is predicated upon a federal statute that traces its origins to section 1 of the Civil Rights Act of 1866, 14 Stat. 27 (1866).  This statute, now codified in 42 U.S.C. § 1981, prohibits both public and private racial discrimination in certain specified activities (including the making and enforcement of contracts).  Runyon v. McCrary, 427 U.S. 160, 168-75 (1976).

To state a claim under this statute, a plaintiff must show (1) that he is a member of a racial minority, (2) that the defendant discriminated against him on the basis of his race, and (3) that the discrimination implicated one or more of the activities enumerated in the statute.  Morris v. Dillard Dep't Stores, Inc., 277 F.3d 743, 751 (5th Cir. 2001).  The appellant's averments plainly satisfy the first and second of these requirements.  The battleground, then, is the third.

The appellant attempts to fulfill this requirement by alleging that Radio Shack's discriminatory acts interfered with his right to make and enforce contracts.  That right is one that falls

-6-

within the prophylaxis of section 1981. See 42 U.S.C. § 1981 (quoted infra note 1). The critical question, however, is whether the facts alleged in the appellant's complaint, taken in the light most flattering to his theory of the case, show a sufficient nexus between the asserted discrimination and some contractual right or relationship.

The case law suggests the nature of the requisite nexus. The Supreme Court originally gave section 1981 a narrow focus, declaring that the statute "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." Patterson v. McLean Credit Union, 491 U.S. 164, 171 (1989). But Congress widened the interpretive lens when it enacted the Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071 (1991). That Act amended section 1981 by expanding the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The revised statute — the pertinent text of which is reproduced in the margin[1] — governs this case.

_____

[1]Section 1981, as amended, reads in pertinent part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . .

-7-

We mention this history because the appellant's central thesis is that the 1991 amendment elongates the reach of the statute sufficiently to link the two types of racially discriminatory treatment alleged here — the unwanted surveillance and the intrusion of the police into the appellant's abode — to the appellant's contract rights. The district court rejected both facets of this argument. It ruled that the surveillance was not actionable under section 1981 because the appellant "purchased his supplies and went home, without any interference based upon his race." Garrett, 142 F. Supp. 2d at 119. It ruled that the later events were not actionable under section 1981 because "[t]he objectionable conduct . . . did not have anything to do with the purchase [that the appellant] made," and, thus, neither affected the making or enforcement of a contract nor implicated the appellant's contractual rights. Id. The appellant asseverates that these rulings rest on an overly grudging reading of the revised statute.

---

        *            *          *

    For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

        *            *          *

42 U.S.C. § 1981(a)-(b).

Although the 1991 amendment broadened the scope of section 1981, our own case law is unilluminating as to the extent of this expansion.[2] We turn, therefore, to our sister circuits for enlightenment.

The preeminent case is <u>Morris</u> v. <u>Office Max, Inc.</u>, 89 F.3d 411 (7th Cir. 1996). There, two black customers were browsing innocently in a retail store. The assistant manager became suspicious and called the police. <u>Id.</u> at 412. The police arrived, hassled the two men (one of whom had completed his purchase and the other of whom had purchased nothing), found no evidence of wrongdoing, and departed (uttering racially derisive comments). <u>Id.</u> The customers sued, accusing the store of violating section 1981. The Seventh Circuit rejected the suit on the ground that the plaintiffs could not "point to specific facts showing that Office Max deprived them of any of the enumerated rights in § 1981 . . . specifically, the right to make and enforce a contract. They were denied neither admittance nor service, nor were they asked to leave the store." <u>Id.</u> at 414.

To like effect is <u>Hampton</u> v. <u>Dillard Dep't Stores, Inc.</u>, 247 F.3d 1091, 1117-18 (10th Cir. 2001), <u>cert.</u> <u>denied</u>, 122 S. Ct. 1071 (2002). In that case, the Tenth Circuit ruled that a woman of

---

[2]We have discussed the import of this amendment on only one occasion. <u>See</u> <u>Danco, Inc.</u> v. <u>Wal-Mart Stores, Inc.</u>, 178 F.3d 8, 12-14 (1st Cir. 1999). That decision dealt with facts so far removed from those involved in this case that it offers scant guidance here.

African-American descent who allegedly had been ejected from a store on the basis of her race could not pursue a section 1981 claim because she had neither attempted nor planned to make any specific purchase (and, accordingly, could not prove any interference with a contractual relationship). Id. The court made plain that "the mere expectation of being treated without discrimination while shopping" will not support a claim under section 1981. Id. at 1118. In contrast, the court upheld a judgment for another African-American woman, ejected at the same time, who was attempting to redeem a coupon that she had received incidental to a previous purchase. Id. at 1103-05. The court concluded that the coupon was tantamount to an option contract, and that the store could be held liable for its race-based denial of the right to redeem it. Id. at 1104. The distinction drawn by the Tenth Circuit between the two plaintiffs aptly illustrates the need for a contractual nexus in a suit premised on 42 U.S.C. § 1981.

Another representative case is Morris v. Dillard Dep't Stores, supra. There, an African-American woman had browsed in a department store without making any purchases. 277 F.3d at 746. She was subsequently accused of shoplifting, arrested, and temporarily banned from returning to the store. Id. at 746-47, 751. The woman brought suit under section 1981, claiming that the banishment amounted to a race-based deprivation of a contractual interest. Id. at 751. The Fifth Circuit rejected her section 1981

claim because she did not "offer evidence of some tangible attempt to contract with [the defendant's store] during the course of the ban, which could give rise to a contractual duty between her and the merchant, and which was in some way thwarted." Id. at 752. In fine, the facts were "too speculative to establish loss of any actual contract interest owed to her by [the defendant]." Id. at 753.

In Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851 (8th Cir. 2001), cert. denied, 122 S. Ct. 1606 (2002), the Eighth Circuit confronted a situation in which a store employee had accused an African-American customer of shoplifting after the customer had consummated his purchase. Id. at 853. Charges were brought, but dismissed. Id. at 854. The court of appeals held, albeit over a vigorous dissent, that the customer could not bring a claim against the store under section 1981 because "[o]nce [he] paid the cashier and received the [purchase] from the cashier, neither party owed the other any duty under the retail-sale contract." Id.

We are not comfortable with all of these outcomes, nor do we make a wholesale endorsement of the reasoning employed by these courts. Section 1981, insofar as it is pertinent here, pivots on contractual relationships, and the contours of what constitutes a "contract" (or a "contractual relationship," for that matter) are properly found in state law. See Hampton, 247 F.3d at 1104.

-11-

Moreover, shopping in a retail store may involve multiple contracts. Each time a customer takes an item off the shelf, a new contract looms, and each time the item is returned, the potential contract is extinguished.[3] The 1991 expansion of the definition of "make and enforce contracts" in section 1981, then, extends the reach of the statute to situations beyond the four corners of a particular contract; the extension applies to those situations in which a merchant, acting out of racial animus, impedes a customer's ability to enter into, or enjoy the benefits of, a contractual relationship. See Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 872 (6th Cir. 2001) (explaining that, in a "commercial establishment" context, liability will attach when a plaintiff "receive[s] services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory"). So viewed, some of the precedents cited above seem problematic. E.g., Morris, 277 F.3d at 751 (denying liability when the store, allegedly acting out of racial animus, refused access to a prospective customer); Youngblood, 266 F.3d at 854 (denying liability where the customer, allegedly because of racial animus,

---

[3]Although we can find no Maine law on what constitutes a contract in a retail sale context, the decisions of other state courts are uniform in this regard. See, e.g., Fender v. Colonial Stores, Inc., 225 S.E.2d 691, 693-95 (Ga. Ct. App. 1976); Giant Food, Inc. v. Wash. Coca-Cola Bottling Co., 332 A.2d 1, 7-10 (Md. 1975); Barker v. Allied Supermarket, 596 P.2d 870, 870-74 (Okla. 1979). We assume, therefore, that the Maine Supreme Judicial Court would hew to the same line.

-12-

was arrested while still in the store and the purchased items were never returned to him).

In the last analysis, however, the doctrinal rule established in these cases seems sound, even if the application of the rule is questionable. The legislative history of the 1991 amendment makes it crystal clear that Congress did not intend to convert section 1981 into a general prohibition against race discrimination. See H.R. Rep. No. 40 (II), at 37 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 741 ("The Committee intends this provision to bar all racial discrimination in contracts.") (emphasis supplied). It follows, then, that in order to satisfy the foundational pleading requirements for a suit under section 1981, a retail customer must allege that he was actually denied the ability either to make, perform, enforce, modify, or terminate a contract, or to enjoy the fruits of a contractual relationship, by reason of a race-based animus. See Morris, 277 F.3d at 752; Hampton, 247 F.3d at 1118; Office Max, 89 F.3d at 414. The pivotal question in this case is whether the allegations of the amended complaint suffice to meet this benchmark.

Of course, section 1981, like many laws, is more easily interpreted at the polar extremes. The statute applies, for example, if a store refuses, on race-based grounds, to permit a customer to purchase its wares. By the same token, it does not apply if no contractual relationship is ever contemplated by either

party (say, if a store manager makes a racially insensitive comment to a fireman who responds to a false alarm). The harder cases occupy the middle ground: cases in which a contract was made and the alleged discrimination bears some relation to it. The case at bar falls into this "middle" category. Particularly after the passage of the 1991 amendment, such situations call for careful line-drawing, case by case.

As said, the appellant has advanced two theories of liability under section 1981. The first theory posits that he was deprived of contractual rights when Radio Shack's staff put him under surveillance while he was in the store. This theory fails because the appellant has not alleged that the surveillance entailed harassment or otherwise interfered with his ability to make desired purchases. To the contrary, his amended complaint leaves no doubt but that, during his visit to the store, Radio Shack's employees were helpful and courteous; they facilitated his purchase of the items he selected, and even reached out to other branches in an effort to locate an out-of-stock product that he wished to buy.[4]

On this point, then, the appellant's case boils down to the claim that he was watched carefully while on the premises. Unadorned, that claim cannot succeed. In a society in which

_____

[4]We think it is important that the appellant does <u>not</u> allege that Radio Shack had the police scanner in stock and refused to sell it to him.

shoplifting and vandalism are rife, merchants have a legitimate interest in observing customers' movements. So long as watchfulness neither crosses the line into harassment nor impairs a shopper's ability to make and complete purchases, it is not actionable under section 1981. See Office Max, 89 F.3d at 414 (rejecting claim when plaintiffs "were denied neither admittance nor service, nor . . . asked to leave the store"). In other words, the challenged surveillance must have some negative effect on the shopper's ability to contract with the store in order to engage the gears of section 1981. See Hampton, 247 F.3d at 1108 (noting that discriminatory surveillance "on its own [is] not actionable under § 1981"); Lewis v. J.C. Penney Co., 948 F. Supp. 367, 371-72 (D. Del. 1996) (same).

The appellant's second theory presents a closer call. He posits that Richard branded him a potential thief and reported him to the police for no reason other than the color of his skin, and that, as a result, he was deprived of the enjoyment of his purchases when the police subsequently intruded on his sanctuary. The difficulty with this theory is that the appellant fully consummated the contract while he was in the store (i.e., he completed the purchase of a book, a telephone, and some batteries) and thereafter retained the items that he acquired. His own complaint makes clear that he made these purchases without impedance and thenceforth enjoyed the use and ownership of the

goods without interruption. The alleged harassment — the appearance of the police on his doorstep — did not occur until long after he had left the Radio Shack outlet. Moreover, that visit bore no real connection to the contractual relationship; for aught that appears, it was the appellant's presence in the store, not his purchase of goods, that provoked the manager's suspicions. Nor does the amended complaint allege facts indicating that the police officers attempted in any way to deprive the appellant of the items he had acquired. The short of the matter is that, taking as true the scenario presented by the amended complaint, the appellant's contractual rights were not impaired (and, therefore, no violation of section 1981 occurred).[5]

The appellant attempts to parry this thrust by arguing that his contractual relationship with Radio Shack extended to a possible return of the purchased items, and that the visit from the police dampened his ardor for effectuating such a contract modification. The first part of this compound allegation is true:

_____

[5]To be sure, one court has read section 1981 rather expansively. See, e.g., Christian, 252 F.2d at 873 (stating that a "plaintiff need only show that she intended to make a purchase and was asked to leave the establishment in order to prevent her from making the purchase on account of her race in order to satisfy the 'make and enforce contracts' clause of § 1981"). This case does not require us to delve into the soundness of this position; the appellant's claims would not pass muster even under the broader construction advanced by the Sixth Circuit. See id. at 872 (requiring a plaintiff to demonstrate that, while shopping, he "received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory").

the right to return merchandise is incident to, and, thus, part of, the prototypical retail contract. The second part of the allegation, however, is a non-sequitur. In order to state a claim upon which relief can be granted under section 1981, a complaint must allege the actual loss of a contract interest, not simply the theoretical loss of a possible future opportunity to modify the contract. Morris, 277 F.3d at 751; Hampton, 247 F.3d at 1118; Office Max, 89 F.3d at 414. The possibility of returning some or all of the goods does not pass through this screen.

In the first place, the appellant has not alleged that he took any steps to modify the purchase contract, that is, he never notified Radio Shack of his desire to return the goods, nor did he attempt in any way to effectuate their return. We do not think that a customer can hold a merchant liable for denying the right to a refund that the customer never pursued. Furthermore, the amended complaint alleges no facts from which it fairly can be inferred that the indignity of a visit from the police somehow hindered the appellant from seeking to return the purchased wares. The naked assertion that a party might have elected to return a previously purchased product had he believed the environment to be more welcoming is simply too ephemeral a hook from which to hang a cause of action under 42 U.S.C. § 1981. See Office Max, 89 F.3d at 414 (terming a similar allegation "speculative and insufficient to state a claim under § 1981"); cf. Morris, 277 F.3d at 752

-17-

(requiring plaintiffs to provide "evidence of some tangible attempt to contract with [the store]"); <u>Hampton</u>, 247 F.3d at 1118 (rejecting a claim that the mere receipt of a coupon ancillary to a purchase creates a contractual relationship under section 1981).

For these reasons, we conclude that the amended complaint fails to state an actionable claim under 42 U.S.C. § 1981. When the appellant was in the store, he faced no hostility from the staff. By the time that he returned home, his contract with Radio Shack had been fully performed, and he was not deprived of the benefit of the bargain by subsequent events.

There is one loose end that we must secure. Count 1 of the amended complaint also mentions 42 U.S.C. § 1982, which prohibits racial discrimination in the purchase of property. Like section 1981, section 1982 has its roots in section 1 of the Civil Rights Act of 1866. Due to the statutes' similar wording and common lineage, sections 1981 and 1982 are traditionally construed <u>in</u> <u>pari</u> <u>materia</u>. <u>See</u> <u>Runyon</u>, 427 U.S. at 171. With that in mind, we are confident that our reasoning vis-à-vis section 1981 (and, thus, our holding) applies with equal force to any claim that the appellant might have under section 1982. Simply put, the facts set forth in the amended complaint fail to show a sufficient nexus between the alleged discrimination and the appellant's purchase of goods (i.e., tangible personal property).

To say more with respect to this count would be supererogatory. For the reasons elucidated above, we affirm the district court's decision to dismiss the appellant's federal claims.

## B. **Defamation**.

This leaves the slander claim (count 3). Under Maine law, a cause of action for defamation arises from (1) the defendant's unprivileged publication to a third party (2) of a false statement pertaining to the plaintiff (3) through fault amounting at least to negligence, (4) as long as the statement either is defamatory per se or causes special harm. Rippett v. Bemis, 672 A.2d 82, 86 (Me. 1996). False accusations of criminal wrongdoing comprise defamation per se. Id.

Speech is constitutionally protected, however, see U.S. Const. amend. I, and not all false statements are actionable. In this regard, settled First Amendment jurisprudence distinguishes, inter alia, between statements of fact and statements of opinion. Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 127 (1st Cir. 1997). But framing the inquiry exclusively in those terms is a gross oversimplification: even a statement that is couched as an opinion may be actionable if it reasonably could be understood by the ordinary listener as implying the existence of undisclosed facts that are false and defamatory. Id.

-19-

The seminal case on the subject of First Amendment protection for expressions of opinion is <u>Milkovich</u> v. <u>Lorain Journal Co.</u>, 497 U.S. 1 (1990). In <u>Milkovich</u>, a newspaper had printed a column in which it called the plaintiff (a wrestling coach) a liar for what the columnist thought was deceitful testimony before a high-school athletics council. <u>Id.</u> at 4-5 & n.2. The newspaper argued that the column merely stated the columnist's opinion and therefore enjoyed an absolute First Amendment protection. <u>Id.</u> at 17-18. The Court rejected this argument, declaring that "[t]he dispositive question in the present case [is] whether a reasonable factfinder could conclude that the statements in the [newspaper] column imply an assertion that [the coach] perjured himself in a judicial proceeding." <u>Id.</u> at 21. Because the underlying facts mentioned in the column were "susceptible of being proved true or false," the accusation was not a protected opinion. <u>Id.</u>

Against this backdrop, we return to the case at hand. The amended complaint alleges that, following Radio Shack's discovery of the missing computer, the store manager, "without having performed a reasonable investigation and in bad faith," singled out the appellant and "informed the Brunswick, Maine Police Department that he suspected [the appellant] of the theft." Taking this allegation to mean that Richard actually used the phrase "I suspect" when he contacted the authorities, the district court

ruled that the statement constituted a non-actionable opinion.

Garrett, 142 F. Supp. 2d at 120-21.  The court reasoned:

> To suspect is to surmise, based on little or no evidence.  The statement's very uncertainty stops it from implying anything defamatory (for example, it does not imply that the manager actually saw [the appellant] stealing the computer).  Rather, if it implies any factual assertions at all, they are not defamatory (for example, it might imply underlying assertions such as that [the appellant] was at the store before the computer was discovered missing, or, more seriously but still not defamatory, that [the appellant] had behaved in some way the manager deemed suspicious).

Id. at 121 (footnote omitted).  On this basis, the court dismissed count 3 of the amended complaint.[6]  Id.

The appellant takes issue with this reasoning.  An accusation that X "suspects" Y of having committed a crime, he argues, is not necessarily a non-actionable statement of opinion, but, rather, a statement that implies the existence of underlying facts that can be proven true or false (and, thus, potentially actionable).  Building on this foundation, he posits that the district court acted prematurely in dismissing the defamation claim on the face of the pleadings.

---

[6]The appellant thereupon attempted to amend his complaint further by replacing "suspect" with a more substantive verb.  The district court denied the motion as futile.  Given our disposition of this aspect of the appeal, see text infra, we have no occasion to consider this ruling.

We find this argument persuasive. "Words may sometimes be chameleons, possessing different shades of meaning in different contexts." United States v. Nippon Paper Indus. Co., 109 F.3d 1, 4 (1st Cir. 1997). This description fits the verb "suspect." A statement like "I suspect that the Patriots will win the Super Bowl next year," made by a football fan at a tailgate party, is plainly a guess (and, indeed, may represent the triumph of hope over reason). In contrast, a statement like "I suspect that your house is infested by termites," made by an exterminator after inspecting a dwelling, implies the existence of undisclosed facts — something seen or noted in the course of the inspection — that have led the speaker to a reasoned conclusion. Context makes the difference — and by "context" we mean such factors as the identity of the speaker, the identity of the audience, the circumstances in which the statement is made, what else is said in the course of the conversation, and a myriad of other considerations. We conclude, therefore, that a speaker's use of a prefatory term such as "I suspect" does not automatically inoculate him against liability for defamation.

We are not the first court to find a speaker's use of a preface such as "I suspect" or "I believe" or "I think" to be non-dispositive for purposes of a defamation claim. Judge Friendly observed two decades ago that "[i]t would be destructive of the law of libel if a writer could escape liability for accusations of

-22-

crime simply by using, explicitly or implicitly, the words 'I think.'" Cianci v. New Times Pub'g Co., 639 F.2d 54, 64 (2d Cir. 1980). Maine's Supreme Judicial Court adhered to this principle in True v. Ladner, 513 A.2d 257 (Me. 1986). There, a former teacher who had applied for a job elsewhere brought a defamation suit against a school superintendent who had made negative comments to the prospective employer. Id. at 260. Although the superintendent had couched his comments as opinions, see id., the court concluded that those comments, taken in context, implied that the superintendent was in possession of undisclosed facts. Since those facts were incorrect and the statements defamatory, the court upheld a verdict for the quondam teacher. Id. at 262.

If any doubt remained, Milkovich dispelled it. Discussing the same phenomenon, the Court offered the following example:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

497 U.S. at 18-19.

-23-

Based on these authorities, we conclude that Richard's use of the term "I suspect" is not determinative of whether his statement to the police is actionable. To answer that question, we must know more about the context. The amended complaint, however, does not take us very far. It reveals only that the appellant employed the terms "suspect" and "suspicion" in a general sense, seeking to convey the idea that Richard had contacted the police to tell them of the theft and of his belief — at what level of certitude is unclear — that the appellant was the culprit.[7] From the available information, the most that can be said is that Richard's statement implied that he had some basis for pointing the finger at the appellant — but we cannot tell, without additional contextual trappings, whether that basis was real or imaginary, correct or incorrect, reasonable or unreasonable. Consequently, we are unable to ascertain at this early stage of the proceedings whether the challenged statement constitutes fact-based defamation.

This lack of certainty is telling. The method of Rule 12(b)(6) requires courts (not only the district court, but also this court on appellate review) to resolve all realistic possibilities in the pleader's favor. See, e.g., Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 16 (1st Cir. 1989) (noting that,

---

[7]Indeed, given the fact that the lower court dismissed the case before any pretrial discovery could be conducted, the appellant likely did not have knowledge of precisely what words Richard used to instigate the police investigation.

under Rule 12(b)(6), courts must not only "accept all well-pled factual averments as true," but also must "draw all reasonable inferences therefrom in [the pleader's] favor"). At the Rule 12(b)(6) stage, then, it is enough for a plaintiff to sketch a scenario which, if subsequently fleshed out by means of appropriate facts, could support an actionable claim. See Swierkiewicz v. Sorema N.A., 122 S. Ct. 992, 997-98 (2002); Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, 958 F.2d 15, 17 (1st Cir. 1992). This sets the bar quite low, and the scenario alleged here clears it.[8]

Radio Shack attempts to blunt the force of this reasoning by insisting that Richard's statement to the police was true: the appellant was a suspect in the theft. Radio Shack's fundamental premise is sound in that truth is an absolute defense to a charge of defamation. E.g., Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 770 (1986). Radio Shack's conclusion, however, does not follow from this premise. As the Supreme Court has explained:

> [T]he statement, "I think Jones lied," may be provable as false on two levels. First, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied. It is, of course, the second level of falsity which would ordinarily serve as the basis for a defamation action, though falsity at the first level may serve to

---

[8]This scenario includes, inter alia, both the store manager's accusation and the further allegation that Radio Shack, in a flagrant display of racial profiling, turned over to the police only the appellant's name, not the names of the white customers who were in the store at the same time.

> establish malice where that is required for
> recovery.

Milkovich, 497 U.S. at 20 n.7.  Here, the critical question is not whether Richard actually believed that the appellant stole the computer, but, rather, whether the accusation was true (and if not, what basis Richard had for making it).

We need not paint the lily.  The facts alleged in the amended complaint leave open the possibility that Richard called the police and accused the appellant of pilfering merchandise without a reasonable basis in fact.  That possibility is neither fanciful nor wildly improbable.  Thus, the appellant is entitled to discovery in order to clarify exactly what was said and to develop the facts necessary to put what was said in a meaningful context.  Whether or not the claim can then survive summary judgment is another question — and one as to which we take no view.[9]

## III.  CONCLUSION

We summarize succinctly.  We hold, as did the court below, that the amended complaint states no cognizable claim for relief under federal law.  The complaint does, however, state a potential claim for defamation under Maine law, as the challenged

---

[9]We note in passing that statements made in good faith for the purpose of bringing a criminal to justice are eligible for a conditional privilege as long as they are made on reasonable grounds after due inquiry.  Packard v. Cent. Me. Power Co., 477 A.2d 264, 268 (Me. 1984).  The applicability of this conditional privilege to the as-yet-undeveloped facts of this case is not now before us, and we express no opinion on that point.

statement may falsely have implied that Richard had a reasonable basis for suspecting Garrett of the theft.  Thus, the district court erred in granting Radio Shack's motion to dismiss the defamation claim.  See Haworth v. Feigon, 623 A.2d 150, 156 (Me. 1993) (holding that a determination of the context in which a defamatory statement is delivered generally entails a question of fact); see also Fortier v. Int'l Bhd. of Elec. Workers, Local 2327, 605 A.2d 79, 80 (Me. 1992) (explaining that a court only should dismiss a defamation claim as resting on non-actionable opinion when the challenged statement "is incapable of a defamatory interpretation").

We need go no further.  For the reasons stated above, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.  In view of the changed circumstances, the appellant is free, on remand, not only to pursue count 3 of the amended complaint but also to seek reinstatement of count 2.

**Affirmed in part; reversed in part; remanded**.  **No costs**.

**— Separate Opinion Follows —**

-27-

BOUDIN, <u>Chief Judge</u>, <u>concurring in part and dissenting in part</u>. Derived from the 1866 Civil Rights Act, section 1981 secures against racial discrimination, among other things, the right "to make and enforce contracts." 42 U.S.C. § 1981 (1994 & Supp. V 1999). Read narrowly, this phrase could be applied only to outright refusals to sell or deal. Read as broadly as possible, it might be taken to ban all racial discrimination by retail stores (to speak only of the present context) affecting present or prospective customers. The circuit courts have rejected both positions.

The narrow view was rejected when Congress overruled <u>Patterson</u> v. <u>McLean Credit Union</u>, 491 U.S. 164 (1989), in 1991 by defining contract rights more broadly then did the original statute. <u>See</u> <u>Rivers</u> v. <u>Roadway Express, Inc.</u>, 511 U.S. 298, 302 (1994); H.R. Rep. No. 102-40(I), at 141, <u>reprinted in</u> 1991 U.S.C.C.A.N. 549, 670. Even apart from the amendment, racial harassment short of an outright refusal to sell could clearly frustrate an ability to contract. If the police had been called by Radio Shack to arrest Garrett in this case before he made his purchases--and the summons were racially motivated--a section 1981 claim would be stated.[10]

Yet the circuit courts with only slight differences in emphasis have also rejected the broadest construction of section

_____

[10]<u>See</u> <u>Henderson</u> v. <u>Jewel Food Stores, Inc.</u>, 1996 WL 617165 (N.D. Ill. 1996); <u>cf.</u> <u>Christian</u> v. <u>Wal-Mart Stores, Inc.</u>, 252 F.3d 862, 873 (6th Cir. 2001).

1981 as encompassing all racial harassment by retail stores. E.g., Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1118 (10th Cir. 2001). Instead, they have all insisted that section 1981 claims be tied fairly closely to hindrance of a specific effort to purchase. This view has been fostered by the statute's "to make . . . contracts" language and by assumptions as to its main thrust. No doubt it also reflects a concern that too broad a reading would produce countless law suits based on minor or imagined discourtesies inflicted on customers by retail employees.

The search for an intermediate position has led, perhaps inescapably, to circuit court decisions that seem pettifogging, turning on how close the plaintiff was to making a purchase, Morris v. Dillard Dep't Stores, 277 F.3d 743, 752 (5th Cir. 2001), and whether the use of the bonus coupon given at the sale was part of the contractual relation, Hampton, 247 F.3d at 1104. Such distinctions do not correspond to human realities and courts sometimes ignore their logic, e.g., by affording a section 1981 remedy to the customer who is badly harassed but makes the purchase. See Williams v. Cloverland Farms Dairy, Inc., 78 F. Supp. 2d 479, 485-86 (D. Md. 1999); see also Christian, 252 F.3d at 872.

The precedents in other circuits, fairly described by the panel, say that for a section 1981 violation, there must be interference with a specific contract, actual or immediately contemplated; the abstract possibility of future purchases at some indefinite time is not enough. But Radio Shack's action in sending

policemen to Garrett's home to investigate shoplifting after his purchase, if Garrett was singled out solely because he was black, could be deemed a sufficient interference to trigger liability. See Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 856 (8th Cir. 2001) (R. Arnold, J., dissenting).

What one describes as an "interference" with the right to "make" a contract and to "enjoy" its "benefits" depends on judicial construction. Section 1981 is now (post-Patterson) commonly used to remedy racial discrimination in the continuing employment relationship, see Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 13 (1st Cir. 1999), yet to do so is to interpolate reasonable expectations: employment contracts do not normally say that freedom from harassment is a contracted for benefit of employment. Similarly, one who makes a purchase at Radio Shack would not ordinarily expect that a no-doubt humiliating visit from the police, prompted by racial bias on the store's part, would directly follow.

Under the amendment, protection does not stop with the formation of the contract. Rivers, 511 U.S. at 302; Danco, 178 F.3d at 13. The fact that Garrett left the store with his purchases should not exhaust all that he is entitled to expect from (to use the amendment's term) the "the enjoyment of all benefits . . . of the contractual relationship." 42 U.S.C. § 1981(b). Imagine, merely as an example, that the purchase had been on credit, that Garrett had been slow to pay, and that (solely because

of racial prejudice) the store as a matter of policy had pursued its claim against him with special harshness.

Finally, even on the panel's own reading of the statute, the section 1981 claim ought to be remanded. Garrett has alleged that he intended to return some of what he purchased. This claim was belated and could certainly be challenged, but it ought not be rejected out of hand on a motion to dismiss. See Hickerson v. Macy's Dep't Store, 1999 WL 144461 (E.D. La. 1999) (returning an item constitutes a modification of a contract). And, if Garrett had a specific intent to return the item, his ardor could certainly have been cooled by a visit from the police once Garrett learned that he had been singled out by the store because of his race.

Assuredly, problems exist in the use of section 1981 to superintend retail shopping: as in employment cases, lurid claims can be easily made, but less easily disproved, based on alleged oral remarks. Often (unlike employment cases), there is no economic damage. And section 1981 is not blunted by devices used in Title VII, such as agency exhaustion and a short statute of limitation for agency complaints. But courts can take some protective measures; in particular, not every minor slight or suspicion by a store has to be treated as interference.

On the other side of the scale, this case, if the allegations are assumed to be true, is not a trivial matter. A police investigation of someone for shoplifting and a consequent search of one's home is a major indignity and not merely an imagined slight. And, if Garrett's behavior was no different than

-31-

that of other shoppers who visited Radio Shack at the same time (save as to his race), and if he alone was identified to the police, an inference of racial discrimination is more than speculation.

Despite great respect for the panel majority and for the very able district judge, my view is that the section 1981 claim as well as the defamation claim should be remanded for further proceedings.