# United States Court of Appeals
## For the First Circuit

No. 14-1962

THOMAS R. MASON,

Plaintiff, Appellant,

v.

TELEFUNKEN SEMICONDUCTORS AMERICA, LLC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Lynch, Circuit Judges.

Kenneth J. Barnes, with whom Law Office of Kenneth J. Barnes, Anne M. Rice, and Rice Law Office PLLC were on brief, for appellant.
Irvin D. Gordon, with whom Sulloway & Hollis, P.L.L.C. was on brief, for appellee.

July 29, 2015

**SELYA**, **Circuit Judge**.  This case involves a series of shifting employment arrangements.  Plaintiff-appellant Thomas R. Mason asserts that defendant-appellee TSI Semiconductors America, LLC (TSA), formerly known as Telefunken Semiconductors America, LLC, abridged his contractual rights with respect to no fewer than three of these arrangements.  At the summary judgment stage, the district court concluded that Mason had failed to make out a genuine issue of material fact sufficient to sustain any of his claims.  After careful consideration, we reverse in part, affirm in part, and remand for further proceedings.

## I.   BACKGROUND

In 2009, Mason began work in a senior engineering position for Tejas Silicon, Inc. (Tejas), a California-based corporation with an office in New Hampshire.  The terms of Mason's employment were delineated in a written agreement (the Agreement) that took effect on April 1, 2009. The Agreement contained a section entitled "Consequences of Termination of Employment." Part of this section permitted Tejas to terminate Mason's employment without cause upon 60 days' written notice, in which event Mason would be entitled to continued salary payments and benefits for one year.  If, however, the termination was "due to

the acquisition, merger, or buyout by another entity," then Mason's severance pay and benefits would continue for two years.[2]

The Agreement stipulated that Mason's employment was for a fixed term (one year), which would renew automatically on each anniversary of the Agreement's effective date unless either party elected not to renew. An election not to renew could be made by providing written notice no fewer than 30 days prior to the anniversary date.

Mason's employment with Tejas continued uneventfully for two years, and the Agreement renewed automatically on April 1, 2010 and April 1, 2011. The landscape changed, though, in December of 2011 when Mason learned of an impending corporate restructuring.[3] As Mason understood it, Tejas would terminate his employment and TSA would offer him new employment. Soon thereafter, TSA wrote to Mason and offered him employment in his then-current position at his then-current salary, beginning January 1, 2012 (the Offer Letter).

---

[2] The Agreement entitled Mason, in certain circumstances, to immediate vesting of stock options as part of a severance package. Because this appeal is not concerned with the quantum of damages (if any) to which Mason may be entitled, we make no further reference to the stock option provisions.

[3] The parties dispute the nature of the corporate event that ultimately transpired. TSA maintains that Tejas continues to exist as a separate and independent entity; Mason maintains that Tejas was merged into TSA. Our disposition of this appeal does not require us to resolve this dispute, and we shall refer to this event neutrally as the "2011 reorganization."

- 3 -

Mason decided to accept employment with TSA and, in December of 2011, signed four documents: a document entitled "Amendment to Employment Agreement" (the Amendment); the Offer Letter; a document entitled "Employment, Confidential Information and Invention Assignment Agreement" (the New Agreement); and a document entitled "Employee Transfer Agreement and General Release" (the Release). By its terms, the Amendment was to take effect on January 1, 2012. Mason, Tejas, and TSA all signed it, thus memorializing their mutual intent to amend the Agreement.

The Amendment went on to state that, "effective as of January 1, 2012," each reference to Tejas in the Agreement would be replaced by a reference to TSA; that Tejas would "transfer and assign to [TSA] the Agreement and all of its rights, duties and obligations thereunder"; and that TSA would assume those rights, duties, and obligations. It also provided that "the Agreement shall continue under [Mason's] employment relationship with [TSA]."

The Offer Letter, though, provided that Mason's employment with TSA would be "for no specified period of time" and would be "an at-will employment relationship," under which either Mason or TSA could "terminate the relationship at any time, for any reason, with or without cause." Apparently in response to this language, Mason wrote (in the signature block of the Offer

- 4 -

Letter) the words "As Amended (Attached)" and annexed a copy of the Amendment.

The New Agreement contained, in capital letters, Mason's acknowledgment "that, except as set forth in any other written agreement between me and the company, my employment with the company constitutes 'at-will' employment." Mason executed this document without any qualification.

To complete the picture, the Release provided that, in exchange for $1000 and the offer of new employment by TSA, Mason would "ABSOLUTELY AND IRREVOCABLY AND UNCONDITIONALLY" release TSA from "any and all claims" against TSA or its "[r]elated [p]arties," including claims arising "as a result of [his] employment with and separation from employment" as of December 31, 2011. Here again, Mason added a holographic coda, stating cryptically "EXCEPT AS AMENDED IN 'AMENDMENT TO EMPLOYMENT AGREEMENT.'"

In January of 2012, Mason began toiling for TSA. Two months later — on February 29 — TSA sent him an e-mail announcing that the Agreement "will not be extended for an additional one-year period and will automatically expire April 1, 2012." The e-mail proposed that, should the parties "agree to continue the employment relationship on and after April 1, 2012, then the employment relationship shall be in accordance with" the Offer Letter and the New Agreement.

- 5 -

Mason sought to clarify whether his employment with TSA was being terminated as of April 1. In an e-mail sent on March 31, TSA responded that it was not terminating Mason's employment but, rather, was simply declining to renew the Agreement. It went on to state that Mason's subsequent employment would be governed by the documents signed in December of 2011 (including specifically the Offer Letter and the New Agreement). Mason continued to work for TSA until May 17, 2012, when TSA furloughed him as part of a company-wide reduction in force.

Mason did not go quietly into this bleak night. He repaired to a California state court and sued TSA for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of section 203 of the California Labor Code. Citing diversity of citizenship and the existence of a controversy in the requisite amount, TSA removed the case to federal district court. See 28 U.S.C. §§ 1332(a), 1441. It thereafter successfully moved to transfer venue to the District of New Hampshire. See id. § 1404(a).

After the close of discovery, the parties cross-moved for summary judgment. Mason resisted summary judgment on his breach of contract claims, asserting that there were genuine issues of material fact as to whether any of three separate events — the December 2011 reorganization, the February 2012 non-renewal, and the May 2012 layoff — constituted a termination without cause that

triggered the duty to pay severance.  The district court entered summary judgment in favor of TSA upon concluding that on a plain reading of the relevant contractual provisions, none of these events constituted a termination under the Agreement.  See Mason v. Telefunken Semiconductors Am., LLC, No. 12-507, 2014 WL 3962470, at *8 (D.N.H. Aug. 13, 2014).  This timely appeal followed.

## II.  ANALYSIS

We review a decision to grant or deny summary judgment de novo.  See Bisbano v. Strine Printing Co., 737 F.3d 104, 107 (1st Cir. 2013); Avery v. Hughes, 661 F.3d 690, 693 (1st Cir. 2011).  In this instance, Mason appeals only the district court's entry of summary judgment in favor of TSA, not the court's denial of his own motion for summary judgment.  Hence, we take the facts and the reasonable inferences extractable therefrom in the light most favorable to Mason.  See Torres Vargas v. Santiago Cummings, 149 F.3d 29, 30 (1st Cir. 1998).  We will affirm only if we are satisfied that there is no genuine issue of material fact and TSA is entitled to judgment as a matter of law.  See Vineberg v. Bissonnette, 548 F.3d 50, 55 (1st Cir. 2008).  Such an affirmance may rest on any ground made manifest by the record.  See Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).

Since this is a diversity case, we look to federal law for the summary judgment framework and to state law for the

- 7 -

substantive rules of decision.  See Hanna v. Plumer, 380 U.S. 460, 473 (1965); Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 5 (1st Cir. 2011).  The parties have stipulated that California is the wellspring of the relevant state law, and that stipulation jibes with the choice-of-law provisions contained in the Agreement and the Amendment.  Consequently, we accept this stipulation at face value without performing a full-blown choice-of-law analysis.  See Butler v. Balolia, 736 F.3d 609, 612 (1st Cir. 2013); Artuso, 637 F.3d at 5.

This appeal necessarily rises or falls with the breach of contract claims.  In contract disputes, the court may construe clear and unambiguous contract terms as a matter of law.  See Torres Vargas, 149 F.3d at 33.  If, however, ambiguity lurks, an examination of extrinsic evidence "becomes essential."  Id.

California follows the familiar rule that an ambiguity arises if, when viewed in context, a contract term is equally susceptible to more than one reasonable meaning.  See Dore v. Arnold Worldwide, Inc., 139 P.3d 56, 60 (Cal. 2006); Transamerica Ins. Co. v. Superior Court, 35 Cal. Rptr. 2d 259, 264 (Cal. Ct. App. 1994).  Whether a contract term is ambiguous is itself a question of law.  See Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996); Allen v. Adage, Inc., 967 F.2d 695, 698 (1st Cir. 1992).

Against this backdrop, a series of questions must be asked concerning each of Mason's breach of contract claims.  To

begin, an inquiring court must ask whether the dispositive contract language is susceptible to more than one reasonable interpretation. See Torres Vargas, 149 F.3d at 33. If not, the court may proceed to construe the language and dispose of the summary judgment motion accordingly. See Newport Plaza Assocs. v. Durfee Attleboro Bank (In re Newport Plaza Assocs.), 985 F.2d 640, 644 (1st Cir. 1993). But if there is more than one reasonable interpretation, the court must then ask whether the extrinsic evidence reveals a genuine issue of material fact regarding the meaning of the ambiguous language. See Allen, 967 F.2d at 698. If the extrinsic evidence is "so one-sided that no reasonable person could decide the contrary," the meaning of the language becomes evident and the erstwhile ambiguity will not preclude summary judgment. Bos. Five Cents Sav. Bank v. Sec'y of Dep't of HUD, 768 F.2d 5, 8 (1st Cir. 1985). But if the extrinsic evidence bearing on the meaning of the relevant language is "contested or contradictory," summary judgment will not lie. Allen, 967 F.2d at 698 n.3.

With this framework in place, we turn to Mason's breach of contract claims. We address the purported termination events sequentially.

## A. The December 2011 Reorganization.

Mason's flagship claim is that the district court erred in granting summary judgment on his breach of contract claim

arising out of the 2011 reorganization and the concomitant cessation of his employment with Tejas. He argues that the relevant contractual provisions are ambiguous and that a genuine issue of material fact exists regarding the contracting parties' understanding of the Agreement's termination clause.

Termination is not defined in the Agreement, and the drafters obviously used the word in more than one sense. At various places, the termination clause refers to termination "of employment" generally, termination of "[the employee's] employment" specifically, and termination of "employment with the Company." Mason insists that one reasonable interpretation of the Agreement is that the parties intended for termination to have the relatively narrow meaning of termination of employment with Tejas. He suggests that construing a termination clause to require severance payments regardless of new employment comports with the norm for companies in Tejas's industry and with other surrounding language in the Agreement.

TSA demurs. It argues that the plain meaning of "terminate" is to "discontinue" or "sever," and that Mason's employment was neither discontinued nor severed but, rather, transferred seamlessly from Tejas to TSA. Thus, Mason's employment could not have "terminated" because he was never without a job.[4]

_____

[4] There is some inherent tension in TSA's position. On the one hand, it argues that it is not a successor entity to Tejas and

- 10 -

"[W]ords are like chameleons; they frequently have different shades of meaning depending upon the circumstances." United States v. Romain, 393 F.3d 63, 74 (1st Cir. 2004). This adage is relevant because the termination clause in the Agreement is imprecise and, as such, is susceptible to either of the competing interpretations urged by the litigants. After all, the Agreement uses the word "termination" loosely, in reference to "termination of employment," termination of "[the employee's] employment," and termination of employment "with the Company." Then, too, with respect to the continuation of benefits, the contracting parties appear to have contemplated the possibility of new employment following termination, yet they did not make clear how that new employment would relate to severance benefits. Finally, the Agreement contemplates the possibility of termination due to "acquisition, merger, or buyout" but does not expressly preclude severance payments even in the event of employment by the successor entity.

In our estimation, TSA's invocation of dictionary definitions does not assist its cause. Even if we assume that

---

the language of the Release (which TSA drafted) indicates that it sought to hire Tejas employees free and clear of obligations owed by Tejas. On the other hand, TSA argues that Mason's employment with Tejas transferred seamlessly from Tejas to TSA without any termination of Mason's employment. "Having one's cake and eating it, too, is not in fashion in this circuit," United States v. Tierney, 760 F.2d 382, 388 (1st Cir. 1985), and we are skeptical that TSA can have it both ways.

"terminate" means "discontinue" or "sever," as TSA insists, Mason's employment with Tejas could reasonably be found to have been discontinued or severed regardless of any "transfer" to TSA. Moreover, our doubts about the meaning of "terminate" must be weighed in light of a legal regime prescribing that "unemployment is not a prerequisite to the right to separation pay." Chapin v. Fairchild Camera & Instrum. Corp., 107 Cal. Rptr. 111, 115 (Cal. Ct. App. 1973). Rather, such a right "may, and frequently does, exist where there is no interruption whatever in the continuity of employment." Id.

The upshot is that the Agreement fails to make clear whether the contracting parties intended that a termination sufficient to trigger the payment of severance benefits could occur even in the event of immediate reemployment by another entity as part of a company-to-company transaction. Consequently, the termination clause is ambiguous as a matter of law.

The question, then, reduces to whether the extrinsic evidence relating to the meaning of the clause is so conclusive that it dispels the ambiguity. See Torres Vargas, 149 F.3d at 33; Bos. Five Cents, 768 F.2d at 8. In ascertaining the meaning of a contract term, evidence of the contracting parties' intent at the time of contract formation is most significant. See People ex rel. Lockyer v. R.J. Reynolds Tobacco Co., 132 Cal. Rptr. 2d 151, 158 (Cal. Ct. App. 2003). This principle applies even where, as

- 12 -

here, one of the litigants was not a signatory to the Agreement: under California law, a successor in interest to a contract who has not renegotiated the terms of the contract is bound by the meaning assigned to its terms by the original parties. See Applera Corp. v. MP Biomeds., LLC, 93 Cal. Rptr. 3d 178, 196 (Cal. Ct. App. 2009); Spector v. Nat'l Pictures Corp., 20 Cal. Rptr. 307, 312 (Cal. Ct. App. 1962). TSA is therefore bound by the shared intent of the contracting parties to the Agreement (Mason and Tejas).[5] See Spector, 20 Cal. Rptr. at 312. Of course, post-formation, pre-dispute conduct also may bear on the meaning of a contract's terms. Under California law, evidence of such conduct may be relevant in ascertaining the contracting parties' shared understanding of a contract's original meaning. See Oceanside 84, Ltd. v. Fid. Fed. Bank, 66 Cal. Rptr. 2d 487, 492-93 (Cal. Ct. App. 1997).

Here the record is largely devoid of any extrinsic evidence showing a shared understanding between Mason and Tejas about the meaning of "termination" as that term is used in the Agreement. What extrinsic evidence exists is not so one-sided as to cure the ambiguity and compel a finding against Mason. For

---

[5] We note that the Amendment did not alter any of the substantive terms of the Agreement. It merely memorialized the parties' understanding that TSA would assume Tejas's rights and duties under the Agreement and effectuated that assumption by substituting TSA for Tejas in the Agreement's text.

example, there is conflicting evidence anent the nature of the 2011 reorganization and whether the contracting parties thought at the time of the reorganization that Mason's employment with Tejas was being terminated without cause.

The post-formation evidence on which TSA relies (principally, Mason's failure to seek severance payments during the first two months of his employment with TSA) is subject to varying interpretations. Furthermore, one of Mason's sworn statements avers that he and Tejas's president (who signed the Agreement on Tejas's behalf) understood the 2011 reorganization to constitute a termination under the Agreement, regardless of whether Mason decided to cast his lot with the successor firm.[6]

As post-formation, pre-dispute evidence, the Amendment itself (although signed by Mason, Tejas, and TSA) tells us very little. Its preamble states that "as part of [a] corporate consolidation and reorganization, Tejas will be merged into and with [TSA] or will be dissolved as a corporate entity after January 1, 2012, and [Mason] will become employed by [TSA] as of January 1, 2012." Withal, the Amendment is totally silent as to the

_____

[6] We note that Mason also relies upon the sworn statement of the former Tejas president as evidence that Tejas terminated Mason's employment within the meaning of the Agreement. As the admissibility of this affidavit was controverted in the court below, we give it no weight in our analysis. Similarly, we leave open the relevance of a document composed by TSA as part of the 2011 reorganization (colloquially known as "Exhibit A").

mechanics of how Mason would cease to work for Tejas and start to work for TSA. It is equally silent as to the implications of those actions, including whether Mason was entitled to severance benefits as a result.

The short of it is that ascertaining the meaning of the termination clause in the context of the 2011 reorganization hinges largely on the credibility of Mason's claims as to the contracting parties' shared intent and the inferences to be drawn from the circumstances surrounding the signing of the Amendment and the parties' conduct. Such matters are open to reasonable dispute and, therefore, are not the stuff of summary judgment. Rather, they are squarely within the province of the factfinder. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 206 (1st Cir. 2006).

TSA has a fallback position. It argues that even if Mason's employment with Tejas was terminated in December of 2011, the Release operated to absolve TSA of any liability for severance benefits owed to Mason. This argument lacks force.

By its terms, the Release discharged TSA from "any and all claims" that Mason may have had, including any claims resulting from his separation from employment effective December 31, 2011. TSA posits that this instrument extinguished any claim that Mason may have had against TSA for severance benefits as a result of the termination of his Tejas employment. Although this argument has

- 15 -

a certain superficial appeal, it fails to take into account Mason's handwritten coda to the Release, which stated "EXCEPT AS AMENDED IN 'AMENDMENT TO EMPLOYMENT AGREEMENT.'" According to one of Mason's sworn statements, this coda was intended to exempt from the Release any severance obligations Tejas owed to him under the Agreement — and its wording is reasonably susceptible to that interpretation. And if those obligations were exempted from the Release — a matter on which we take no view — TSA might have assumed them by operation of the Amendment.

To sum up, the handwritten coda, though not compelling Mason's construction, renders the Release susceptible to more than one reasonable interpretation. Extrinsic evidence in the record does not relieve this uncertainty. It follows that the Release does not, as a matter of law, bar Mason's claim for severance benefits arising out of the 2011 reorganization. See Torres Vargas, 149 F.3d at 33; Allen, 967 F.2d at 698 n.3.

That ends this aspect of the matter. Because genuine issues of material fact permeate the record, the district court should not have granted TSA's motion for summary judgment on Mason's claim for severance benefits arising out of the 2011 reorganization.

### B.   The February 2012 Non-Renewal.

Mason next claims that TSA terminated his employment without cause when it notified him in February of 2012 that it

would not renew the Agreement but would let it expire on March 31, 2012.  The district court rejected this claim, granting summary judgment in favor of TSA on the basis that non-renewal was not tantamount to termination.  See Mason, 2014 WL 3962470, at *8.

As said, the effective date of the Agreement was April 1, 2009.  Its non-renewal clause explains that Tejas (and by substitution, TSA) agreed to employ Mason "for a period commencing on the Effective Date and ending on the first anniversary of the Effective Date (the 'Term')."  The "Term" would be extended for additional one-year periods unless either party gave written notice of its exercise of the non-renewal option "at least thirty (30) days prior to the applicable anniversary of the Effective Date."

Mason first asserts that the non-renewal clause is ambiguous as to whether the exercise of the right of non-renewal had the effect of ending his employment with TSA or simply ending the protections provided by the Agreement.  In his view, employment under the Agreement was not merely "labor for wage" but, rather, "a specific relationship with a specific employer . . . for particular and agreed upon terms and conditions."  When employment under those terms and conditions ended, his thesis runs, the employment itself was necessarily terminated and the duty to pay severance benefits was kindled.

- 17 -

Words are not infinitely malleable, see, e.g., Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 129 (1st Cir. 1997), and a contract term is not ambiguous simply because an imaginative party conjures up an alternate interpretation, see F.D.I.C. v. Singh, 977 F.2d 18, 22 (1st Cir. 1992); Lockyer, 132 Cal. Rptr. 2d at 158. Read naturally, the non-renewal clause is not susceptible to Mason's proffered interpretation. After all, a contract term should not be construed in isolation; rather, it should be construed in light of the contract as a whole. See, e.g., Powerine Oil Co. v. Superior Court, 118 P.3d 589, 598 (Cal. 2005). By the same token, a court should construe a contract to give effect to each material term and not to render any term meaningless. See Lueras v. BAC Home Loans Servicing, LP, 163 Cal. Rptr. 3d 804, 823 (Cal. Ct. App. 2013). These tenets help to explain why Mason's claim fails.

"Non-renewal" and "termination" are distinct terms having different meanings.[7] Here, moreover, the structure of the

_____

[7] "Termination" is typically defined as the "act of bringing to an end or concluding," Webster's Third New International Dictionary 2359 (2002), or a "conclusion or discontinuance," Black's Law Dictionary 1700 (10th ed. 2014). By contrast, "nonrenewal" means "a failure to renew," see id. at 1220, where "renew" typically means to "make or do again," Webster's Third New International Dictionary 1922 (2002), or to "restor[e] or reestablish[]," Black's Law Dictionary 1488 (10th ed. 2014). This difference in meaning is all the more clear where, as here, the words refer to different objects: as to termination, the Agreement speaks to various kinds of termination of employment, but as to

- 18 -

Agreement makes it nose-on-the-face plain that the contracting parties never intended to use those distinct terms synonymously. First, the non-renewal clause appears in section two of the Agreement under the heading "Term," whereas the termination clause appears in section six under the heading "Consequences of Termination of Employment." See, e.g., Alameda Cnty. Flood Control v. Dep't of Water Res., 152 Cal. Rptr. 3d 845, 862 (Cal. Ct. App. 2013) (applying rule that "[w]here the same word or phrase might have been used . . . in different portions of a [contract] but a different word or phrase having different meaning is used instead, the construction employing that different meaning is to be favored" (internal quotation marks omitted)). Second, the contracting parties' intent to define different meanings is well-illustrated by comparing the 30-day notice requirement in the non-renewal clause with the 60-day notice requirement in the "without cause" portion of the termination clause. If the parties had intended non-renewal to constitute termination under the Agreement, there would have been no need for disparate notice periods. Indeed, such disparate periods would make no sense.

In an effort to blunt the force of this reasoning, Mason argues that the disparate notice periods do not foreclose the possibility that non-renewal is a form of termination. He suggests

non-renewal, the Agreement speaks to non-renewal of the term of the contract.

that a jury reasonably could conclude that the contracting parties agreed to a shorter notice period for non-renewal because they anticipated the possibility that a decision not to renew might occur closer to the anniversary date. But common sense defenestrates this suggestion. For one thing, Mason's interpretation would hollow out the bargained-for 60-day notice requirement for termination without cause. For another thing, there is a common-sense explanation for the disparate notice periods: that termination would end employment with TSA altogether whereas non-renewal would only eliminate certain protections under the Agreement. Mason's suggested reading completely overlooks this explanation.

The marketplace rationale for such a common-sense reading is apparent. The severance provisions for termination without cause are generous (but perhaps more ephemeral than Mason would have liked), and the contracting parties may well have wanted to ensure that either side could revisit those provisions periodically. The non-renewal clause offered the parties just such a vehicle.

To say more about this claim would be supererogatory. We hold that the non-renewal clause is not ambiguous in the context of the Agreement as a whole. See Dore, 139 P.3d at 60. Giving the contract language its plain meaning, see id., TSA's exercise of the non-renewal option did not work a termination of employment

within the meaning of the Agreement and, thus, did not trigger an entitlement to severance payments. Accordingly, the district court did not err in granting summary judgment on this claim.

## C. **The May 2012 Layoff.**

In the court below, Mason contended that TSA's termination of his employment as part of a company-wide reduction in force on May 17, 2012 constituted termination without cause within the purview of the Agreement and, thus, triggered an entitlement to severance payments. Because Mason did not renew this contention in his opening brief on appeal, he waived it. See DeCaro v. Hasbro, Inc., 580 F.3d 55, 64 (1st Cir. 2009). And while Mason did attempt to resurrect this contention in his reply brief, that was too late. See Cipes v. Mikasa, Inc., 439 F.3d 52, 55 (1st Cir. 2006); Sandstrom v. ChemLawn Corp., 904 F.2d 83, 87 (1st Cir. 1990).

We add that even if this contention had been preserved on appeal, it would fail in light of our holding that TSA's timely exercise of its right of non-renewal terminated the Agreement without terminating Mason's employment. See supra Part II.B. We explain briefly.

To begin, TSA validly exercised its right of non-renewal effective March 31, 2012. Consequently, Mason's subsequent employment was not covered by the Agreement but, instead, was for "no specified term." Cal. Lab. Code § 2922. Under California

law, employment without a fixed term is presumed to be at will. See id.; Guz v. Bechtel Nat'l, Inc., 8 P.3d 1089, 1100 (Cal. 2000).

Mason attempts to overcome this presumption. He suggests that since he continued to work for TSA after the expiration of the Agreement, performing the same tasks under the same job title for the same salary and benefits as he previously had received, an implied-in-fact contract arose between April 1 and May 17. In his view, this implied contract amounted to a continuation of the Agreement, so that he enjoyed the same severance protections on May 17 as he had when the Agreement was in force.

This is little more than wishful thinking. Under California law, a court cannot imply a contract in fact containing terms that directly contradict terms of an express at-will agreement. See Tomlinson v. Qualcomm, Inc., 118 Cal. Rptr. 2d 822, 830 (Cal. Ct. App. 2002); Halvorsen v. Aramark Unif. Servs., Inc., 77 Cal. Rptr. 2d 383, 385 (Cal. Ct. App. 1998). This is especially true where the written agreement was signed by the employee and expressly limits the manner in which the at-will provisions may be altered. See, e.g., Starzynski v. Capital Pub. Radio, Inc., 105 Cal. Rptr. 2d 525, 529 (Cal. Ct. App. 2001). Here, Mason signed two documents in December of 2011 — the Offer Letter and the New Agreement — which explicitly acknowledged that, absent the Agreement, his employment with TSA would be at will.

What is more, each document stipulated that the at-will provisions could not be altered except by a writing signed both by Mason and TSA's president. In the face of these unmodified documents, Mason cannot overcome the presumption that his employment on May 17 was at will. See id. Therefore, his layoff did not entitle him to the prophylaxis of the Agreement (which had by then expired). See Halvorsen, 77 Cal. Rptr. 2d at 385.

In an effort to change the trajectory of the debate, Mason argued below that even if his implied contract argument failed, the non-renewal of the Agreement did not take effect on April 1 because the Amendment (which had an effective date of January 1) by some mysterious alchemy caused the Agreement's effective date to migrate from April 1 to January 1. By this logic, the non-renewal could not have been effective before December 31, 2012 — and Mason would have still been covered by the Agreement (and its severance protections) when he was laid off in May.

This argument is jejune. The Amendment makes pellucid that the only aspect of the Agreement that it altered was to substitute TSA for Tejas. It provided that this substitution would take effect on January 1, 2012, but it did not provide that either the term of the Agreement or its effective date would in any way be revised.

That is game, set, and match. We hold that Mason's claim for severance benefits stemming from his layoff on May 17, 2012 has been waived; and that, in all events, summary judgment on that claim was appropriate.

**III. CONCLUSION**

We need go no further.[8] For the reasons elucidated above, we <u>reverse</u> the district court's summary judgment ruling in part, <u>affirm</u> that ruling in part, and <u>remand</u> for further proceedings consistent with this opinion. No costs shall be taxed on appeal.

**So Ordered.**

---

[8] Our decision today does not deal with Mason's claim for breach of the implied covenant of good faith and fair dealing. Even though the district court did not address this claim in any meaningful way, it granted judgment on the case as a whole, and Mason took pains to preserve this particular claim on appeal. Given this sequence of events, we deem it prudent to refrain from addressing the matter here and, instead, leave it open on remand. <u>Cf.</u> <u>United States</u> v. <u>Ticchiarelli</u>, 171 F.3d 24, 29 (1st Cir. 1999). In contrast, Mason did not preserve on appeal his claim for a violation of the California Labor Code. Thus, we deem that claim foreclosed on remand. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Connell</u>, 6 F.3d 27, 30 (1st Cir. 1993).