# United States Court of Appeals
## For the First Circuit

No. 22-1488

VALERIE SULLIVAN,

Plaintiff, Appellant,

v.

ETECTRX, INC., a Delaware Corporation; JEFFREY P. SPAFFORD;
EDWARD H. HENSLEY; RICHARD J. KRUZYNSKI; ETRX HOLDINGS, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Kayatta, Gelpí, and Montecalvo,
Circuit Judges.

David J. Shlansky, with whom Colin R. Hagan and Shlansky Law
Group, LLP were on brief, for appellant.
Aaron M. Katz for appellees.

May 11, 2023

**KAYATTA**, <u>**Circuit Judge**</u>.  Valerie Sullivan worked for etectRx, Inc. ("etectRx"), a digital health company, as its CEO from August 2020 until August 2021.  Her one-year, automatically renewable employment agreement required etectRx to pay her twelve months of salary as severance benefits in the event her "employment [wa]s terminated by the Company" without cause or if Sullivan terminated her employment for good reason.  After etectRx decided that it no longer wished to continue its relationship with Sullivan as defined in the employment agreement and she subsequently left the company, etectRx refused to pay severance benefits.  The company argued that it merely exercised its right not to renew the employment agreement and thus did not terminate Sullivan's employment.  The district court accepted this argument in granting etectRx's motion to dismiss for failure to state a claim, and Sullivan timely appealed.

We agree that a mere non-renewal of the employment agreement by etectRx would not have entitled Sullivan to severance benefits.  But we also find that Sullivan's complaint adequately alleges that etectRx obligated itself to pay severance benefits by ending her employment under the agreement without cause before the end of the one-year term.  Our reasoning follows.

- 2 -

"[W]e assume that the facts alleged in the complaint, plus reasonable inferences drawn from those facts, are true." Kaufman v. CVS Caremark Corp., 836 F.3d 88, 90 (1st Cir. 2016).

Sullivan began working for etectRx, a digital health company, as a contractor in August 2019. A year later, she began employment as etectRx's CEO, pursuant to a negotiated employment agreement (the "Agreement") dated August 1, 2020. The Agreement was effective for an "Initial Term" of one year and would be "automatically extended for an additional 12-month period commencing at the end of the Initial Term, and successively thereafter for additional 12-month periods . . . , unless either party gives written notice to the other party that such party does not desire to extend the term of this Agreement." Such notice of non-renewal "must be given at least sixty (60) days prior to the end of the Initial Term or the applicable Additional Term."

In addition to allowing non-renewal by sixty days' written notice, the Agreement stated that "either Executive or the Company may terminate Executive's employment with the Company for any reason, at any time, upon not less than thirty (30) days' prior notice." Any such termination by etectRx (except for cause, death,

or disability) would trigger an obligation to pay severance under section 6 of the Agreement, which stated as follows:

> 6. <u>Effect of Termination</u>.
>
> (a) <u>Effect of Termination by Company without Cause or by Executive for Good Reason</u>  If Executive's employment is terminated by the Company for any reason other than [for cause, death, or disability] or by Executive for Good Reason, Executive shall be entitled to receive (i) Executive's monthly Base Salary for twelve (12) months (the **"*Severance Benefit*"**); and (ii) those amounts earned and unpaid under <u>Sections 3(a)</u> and <u>3(b)</u> through the date of termination together with any accrued vacation.

The Agreement also provided that, "[u]pon the expiration of this Agreement or termination of Executive's employment with the Company for Cause, neither party shall have any further obligation or liability under this Agreement to the other party, except as set forth in <u>Sections</u> <u>4</u>, <u>6</u>, <u>7</u>, <u>8</u>, <u>9</u>, <u>10</u>, <u>11</u> and <u>16</u> of this Agreement.  The date of expiration of the Employment Term shall be referred to as the **'*Termination Date*.'**"

Finally, the Agreement included a non-compete covenant barring Sullivan from competing with etectRx "[d]uring the Employment Term and for a period of twelve (12) months following the termination of Executive's employment for any reason (the **'*Non-Compete Period*'**)."

According to Sullivan's complaint, two etectRx board members held a video call with her on May 26, 2021, during which they informed her that her employment with the company was

- 4 -

terminated with immediate effect.  They also asked that she remain as an "at-will" employee through August 1, 2021, the last day of the Initial Term.  The next day, one of those board members sent a letter to Sullivan to "serve[] as written notice by etectRx of its decision not to continue the term of the Agreement beyond the Initial Term" while also asking Sullivan to "remain employed as an at-will employee for continued support during this period."

Sullivan informed etectRx that she would work through the remainder of the Initial Term but refused to continue her employment on an at-will basis beyond that point.  In July, etectRx instructed her to transfer her responsibilities to a new executive. She otherwise continued to perform her duties through August 1, 2021.  On August 2, 2021, etectRx sent an email to Sullivan in which it asserted that Sullivan had abandoned her role.  The following day, etectRx sent Sullivan a letter reminding her of the Agreement's restrictive covenants, including the one-year non-compete provision.  In this letter, etectRx also maintained that it had not terminated Sullivan's employment "with the expiration of the Agreement" because it had asked her to remain employed on at at-will basis.

In due course, Sullivan brought suit against etectRx and three named board members (Jeffrey Spafford, Edward Hensley, and Richard Kruzynski), claiming that etectRx violated the terms of the Agreement and the implied covenant of good faith and fair

- 5 -

dealing, and that etectRx and the three board members violated the Massachusetts Wage Act by failing to provide the severance benefits she was owed. EtectRx filed a motion to dismiss for failure to state a claim, which the district court granted. Sullivan timely appealed.

## II.

We review the district court's order granting a motion to dismiss for failure to state a claim de novo. Germanowski v. Harris, 854 F.3d 68, 71 (1st Cir. 2017). To that end, "we ask whether the well-pleaded factual allegations, viewed in the light most favorable to the plaintiff, . . . 'plausibly narrate a claim for relief.'" Id. (quoting Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012)).

Sullivan's opening brief on appeal raises three arguments. First, that the terms of the Agreement require the payment of severance benefits if the employer opts not to renew the Agreement. Second, that the complaint alleges facts plausibly establishing that etectRx terminated her employment without cause during the term of the Agreement, and therefore that etectRx owes severance benefits even if such benefits are not due merely because of non-renewal. And third, that should she prevail on either of the first two arguments, her complaint also alleges facts entitling her to additional remedies under the Massachusetts Wage Act. We address each argument in turn.

**A.**

The parties agree that Delaware law governs the interpretation of the Agreement. They further agree that the pivotal issue is whether the Agreement entitles Sullivan to severance benefits, based on the facts alleged in the complaint, as supplemented by reference to the Agreement itself. Sullivan's first argument turns on interpretation of the language of the contract, which is a question of law. See Vinton v. Grayson, 189 A.3d 695, 699 (Del. Super. Ct. 2018) ("In Delaware, the interpretation of a contract is a question of law suitable for determination on a motion to dismiss." (quoting Markow v. Synageva Biopharma Corp, C.A. No. N15C-06-152, 2016 WL 1613419, at *4 (Del. Super. Ct. Mar. 3, 2016)(unpublished))). Dismissal is warranted only if the "defendants' interpretation is the only reasonable construction as a matter of law." Id. at 700 (quoting L&L Broad., LLC v. Triad Broad. Co., C.A. No. N13C-10-028, 2014 WL 1724769, at *3 (Del. Super. Ct. Apr. 8, 2014)). Whether a contract is susceptible to more than one of several possible interpretations is a question of law. Allied Cap. Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1030 (Del. Ch. 2006). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two

or more different meanings." Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 739 (Del. 2006) (quoting Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992)).

In dismissing the complaint, the district court held that the Agreement could not be construed as granting severance benefits in the event that the Agreement simply expired upon either party's exercise of its right of non-renewal. In brief, reasoned the district court, non-renewal of the Agreement did not trigger an obligation to pay benefits due only in the event that Sullivan's "employment [wa]s terminated by the Company" without cause.

In so ruling, the district court relied on our prior decision in Mason v. Telefunken Semiconductors America, LLC, 797 F.3d 33 (1st Cir. 2015). Like the district court, we see no good reason to reach a different result than we reached in Mason. Mason's observation that "'[n]on-renewal' and 'termination' are distinct terms having different meanings," id. at 42, applies a fortiori here, with the Agreement expressly referring on the one hand to "expiration of this Agreement" and, on the other hand, to "termination of Executive's employment." The very clause that created a conditional right to severance benefits on its face applied only "[i]f Executive's employment [wa]s terminated by the Company" without cause. As in Mason, the Agreement also established separate notice requirements for non-renewal

- 8 -

(sixty days) and for termination of Sullivan's employment without cause (thirty days). This would make little sense if a non-renewal left the parties in the same position as if the Agreement was terminated without cause. Id. at 43. And the sixty-day notice requirement for non-renewal would be entirely superfluous if etectRx could instead simply terminate Sullivan's employment thirty days from the renewal date, with the same result.

Sullivan rests her contrary reading on a sentence in section 2 of the Agreement stating that "[u]pon the expiration of this Agreement or termination of Executive's employment with the Company for Cause, neither party shall have any further obligation or liability under this Agreement . . . , except as set forth in Sections 4, 6, 7, 8, 9, 10, 11 and 16 . . . ." She points out that section 6(a) is the paragraph that creates a right to severance benefits. And, she says, because those benefits do not apply when the company terminates the Executive's employment for cause, that provision's "survival" must mean that it applies "[u]pon the expiration of this Agreement." Otherwise, she reasons, there would be no reason to include section 6 among those provisions that survive.

Sullivan's argument fails because there is a clear explanation for why severance obligation must survive the expiration of the Agreement, even if a mere expiration does not trigger the severance benefits. The severance obligation could be

triggered prior to the expiration date (by, for example, a termination without cause), in which case the section 2 survival clause ensures that etectRx will pay severance for a full twelve months -- including those months following the expiration date. Said differently, the survival of section 6 ensures that an already-triggered obligation to pay severance does not disappear upon the expiration date. In short, the reference to section 6 is not surplusage under the district court's reading of the Agreement because the reference has meaning and effect even if a non-renewal does not trigger severance.

Finally, Sullivan points again to section 2, noting that it defines the date of expiration of the "Employment Term" to be the "Termination Date." But the question is not whether there was a termination of her employment -- both parties agree that, ultimately, there was. The question is whether there was a termination of Sullivan's employment "by the Company" under section 6 that would trigger severance benefits. As previously noted, this section does not use the defined term "Termination Date," and conditions severance benefits on termination of employment by the Company without cause or by the Executive for Good Reason, not on the expiration of the Agreement.

It is true that, literally, Sullivan's status as an under-contract employee obviously ended if and when the Agreement was not renewed. But that hardly means that a non-renewal rendered

- 10 -

Sullivan's "employment . . . terminated by the Company" without cause. In any event, Mason's holding that non-renewal of an employment agreement is different from termination of employment, plus the Agreement's differential treatment of termination of employment as contrasted with non-renewal, leaves no room for a holding in Sullivan's favor. Therefore, we affirm the district court's rejection of Sullivan's claim that etectRx owes severance benefits even if it merely opted not to renew the Agreement.

**B.**

Sullivan's alternative argument fares better. She contends that her complaint adequately alleges that etectRx actually terminated her employment, without cause, before the contract ran its twelve-month course and thus incurred an obligation to pay severance benefits under the Agreement. We agree with Sullivan on this point.

EtectRx does not dispute that it sought to transition Sullivan from employment under the terms of the Agreement to employment as an at-will employee. Because etectRx made clear that a change from under-contract to at-will employment would not impact Sullivan's compensation or benefits, we can comfortably deduce that the principal difference between employment under the Agreement and employment at-will would relate to termination. As is most relevant, under the Agreement, etectRx had to give Sullivan thirty days' notice to terminate her without cause and also pay

severance. Conversely, as an at-will employee, she could be fired without cause, notice, or severance.

EtectRx contends that it attempted to effect that transition by not renewing the Agreement and thus triggering its expiration on August 1. And as we have just now said, letting the Agreement expire by its own terms would not have resulted in etectRx owing severance benefits to Sullivan. Sullivan, though, alleges that etectRx effected that transition in May by telling her that her employment under the Agreement was terminated with immediate effect and declaring her an at-will employee, thus ending her employment under the Agreement and replacing it with a similar but materially different arrangement. Effectively, etectRx ended the Agreement and unilaterally changed the terms of Sullivan's employment to at-will, leaving her title, duties, and pay identical but stripping the parties of the Agreement's bargained-for protections, including the severance provision.

Because we are reviewing the dismissal of the case under Federal Rule of Civil Procedure 12(b)(6), we must accept as true Sullivan's description of the video call on May 26, and we must construe the May 27 letter in a light fairly favorable to Sullivan. In short, we must assume that in May, etectRx unilaterally and without cause and without prior notice ended Sullivan's employment under the Agreement and converted her employment status to at-will. Such a transition would be a termination by etectRx of

Sullivan's employment without cause or notice entitling her to severance. And this is so even though her transition did not result in actual unemployment before August 1. Cf. Id. at 39-41 (holding that a change in employer due to a corporate restructuring may work a "termination" that triggers severance); see id. at 39 (noting that "unemployment is not a prerequisite to the right to separation pay"; instead, that right "may, and frequently does, exist where there is no interruption whatever in the continuity of employment" (quoting Chapin v. Fairchild Camera & Instrument Corp., 107 Cal. Rptr. 111, 115 (Cal. Ct. App. 1973))). If etectRx could unilaterally convert Sullivan's under-contract employment to at-will prior to the expiration of the contract term, and simultaneously claim not to have terminated her employment for severance purposes, that would strip Sullivan of the contracted-for severance benefits and leave her with no recourse if etectRx decided to fire her the next day, in the middle of the original contract term. The language of the Agreement here does not provide etectRx with that power.

Notably, etectRx does not claim to read the Agreement otherwise. That is to say, it does not claim that it had the power to convert Sullivan to an at-will employee without cause during the term of the Agreement without effectively terminating her employment under the Agreement. Instead, etectRx disputes Sullivan's characterization of its actions and contends that in

- 13 -

the May 27 letter, the company was simply providing the requisite notice of its intent not to renew the employment contract and offering Sullivan the opportunity to continue on as an at-will employee <u>following</u> the expiration of the initial term of employment on August 1, 2021.

There is much common sense supporting etectRx's assertion that in May it was only giving notice of non-renewal while inviting Sullivan to stay on at-will <u>after</u> August 1. It is difficult to see why it would have done what Sullivan claims given that it wanted her to work through at least the end of her initial term. And its May letter was captioned "Notice of Non-Renewal of the Employment Agreement with etectRx, Inc." On the other hand, etectRx offers no explanation for why it would have told Sullivan, as she alleges it did orally on May 26 and then again in its May 27 letter, that she was converted to at-will for the remainder of her initial term. Indeed, conspicuously absent from etectRx's argument is any mention of the May 26 conversation. Sullivan's argument is bolstered by the language etectRx used in its letter, apparently drafted by counsel, which asked that she "remain employed as an at-will employee for continued support during this period." The prior sentence refers to the period "up to and including the Termination Date," so the antecedent for "this period" would seem to be the remainder of the initial term. Thus, it is plausible that etectRx immediately and unilaterally, even if

foolishly, ended Sullivan's under-contract employment without cause and converted her to at-will status in May, triggering an obligation to pay severance benefits.

In any event, the case is at the pleading stage, so our charge is not to weigh competing versions of what happened. Rather, our task is to determine only whether Sullivan has a plausible claim if her allegations are true. And given that she alleges point blank that she was told her employment under the Agreement was terminated "presently" and "with immediate effect," that etectRx requested that she nonetheless remain employed "at-will" for the remainder of her initial term, and that she was instructed to transfer her responsibilities to a new executive in July, she has alleged that etectRx terminated her without cause and without notice, triggering the severance obligation. She has plausibly stated a claim for entitlement to severance benefits.

**III.**

Sullivan also appeals the district court's dismissal of her claim that etectRx breached the implied covenant of good faith and fair dealing by attempting to recharacterize her termination as a non-renewal to avoid paying severance benefits. Under Delaware law, "to state a claim for breach of the implied covenant, [Plaintiff] 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" Kuroda v. SPJS Holdings,

- 15 -

L.L.C., 971 A.2d 872, 888 (Del. Ch. 2009) (quoting Cantor Fitzgerald, L.P., v. Cantor, No. C.A. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)(unpublished)). When a valid contract between the parties expressly governs the dispute, a plaintiff cannot obtain relief through a claim for breach of the implied covenant of good faith and fair dealing. See id. at 889 & n.45 (explaining that the plaintiff could not sustain a breach of the implied covenant of good faith and fair dealing claim when he acknowledged that express terms of the contract at issue "govern[ed] his right to receive the payments he seeks."). As best we can tell from Sullivan's under-developed argument, she contends that etectRx attempted to mischaracterize its without-cause termination of her employment to avoid paying severance benefits. This is coterminous with her breach of contract claim. To the extent that Sullivan argues that her breach of the implied covenant of good faith and fair dealing claim is distinct from her breach of contract claim, she does so for the first time in her reply brief. And, even then, she does not identify "a specific implied contractual obligation" that she contends etectRx breached, nor does she explain why this claim is actionable despite the express contract terms governing the severance benefits at issue here. To that end, Sullivan has failed to state a claim for breach of the implied covenant of good faith and fair dealing.

Because the district court determined that etectRx did not owe severance benefits to Sullivan, it dismissed her Massachusetts Wage Act claim predicated on her being owed those benefits. As we disagree, at least insofar as the motion to dismiss goes, we address Sullivan's Wage Act claim.

"[T]he Wage Act requires the payment of wages on a weekly or biweekly basis. The act provides that 'any employee leaving his [or her] employment shall be paid in full on the following regular pay day,' and that 'any employee discharged from . . . employment shall be paid in full on the day of his [or her] discharge . . . the wages or salary earned by him [or her].'" Mui v. Mass. Port Auth., 89 N.E.3d 460, 462 (Mass. 2018) (quoting Mass. Gen. Laws ch. 149, § 148). Sullivan's claim can succeed only if she demonstrates that the severance benefits at issue are "wages" as that term is used in the Wage Act.[1]

As etectRx notes, the Massachusetts Appeals Court has held that severance benefits are not "wages" for purposes of the Wage Act. Prozinski v. Ne. Real Est. Servs., 797 N.E.2d 415, 419– 21 (Mass. App. Ct. 2003). And "federal courts . . . must follow

---

[1] The Wage Act does not define the term "wages," but Massachusetts courts have construed the term to mean amounts "definitively determined and . . . due and payable to the employee." Mui, 89 N.E.3d at 712 (quoting Mass. Gen. Laws ch. 149, § 148).

the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently." Stoner v. N.Y. Life Ins. Co., 311 U.S. 464, 467 (1940).

Sullivan cannot make this showing. Indeed, the Massachusetts Supreme Judicial Court has thrice cited Prozinski with approval for its holding that the Wage Act does not cover severance pay. See Calixto v. Coughlin, 113 N.E.3d 329, 334 n.9 (Mass. 2018); Mui, 89 N.E.3d at 462; Weems v. Citigroup, Inc., 900 N.E.2d 89, 92 (Mass. 2009).

Moreover, in Mui, the Massachusetts Supreme Judicial Court held that the Wage Act did not encompass a percentage of accrued sick time that the employer gave to departing employees who worked for the employer for at least two years and were not terminated for cause. 89 N.E.3d at 463–64. The court noted that "[t]he only contingent compensation[2] recognized expressly in the act is commissions," and that "[w]e have not broadly construed the term 'wages' for the purposes of the act to encompass any other type of contingent compensation." Id. at 463. Therefore, because the sick pay was "only available to departing Massport employees

---

    [2] In this context, compensation is contingent if it is payable only upon the occurrence of a particular triggering event (in contrast to an amount earned by the performance of work). See Prozinski, 797 N.E.2d at 420 (reasoning that severance benefits are contingent upon the event of severance and are thus distinct from earned wages).

- 18 -

meeting certain criteria," that sick pay did not constitute "wages" for purposes of the Wage Act. Id. at 463-64.

Here, like the sick pay in Mui, the severance benefits are contingent on the departing employee meeting certain criteria, namely that the "Executive's employment is terminated by the Company for any reason other than [for cause, death, or disability] or by Executive for Good Reason."

Nonetheless, Sullivan contends that her circumstance is distinguishable. She argues that, unlike the employees in Mui, Calixto, Prozinski, and Weems, she earned her severance by complying with post-termination obligations, including her non-competition obligations and her agreement to "cooperate and provide assistance to Company in transitioning the work of Executive; ensure a smooth transition; and in answering questions and completing tasks as requested by Company as necessary following termination of employment" (as required by the general release she must sign to obtain severance). But Sullivan's receipt of severance benefits was not wholly dependent on completion of her non-compete obligations. Instead, the severance benefits were contingent on her termination by etectRx not being for cause, death, or disability, and then on Sullivan signing a release and waiver of claims. So we see no basis for holding that her severance benefits, if due, were the type of contingent compensation that Massachusetts classifies as a wage for purposes of the Wage Act.

These post-termination obligations do not distinguish Sullivan's claims from Mui because, regardless of whether Sullivan must perform post-termination obligations to obtain her severance, that severance is still contingent on meeting certain criteria at the time of the departure.

Thus, we affirm dismissal of Sullivan's Massachusetts Wage Act claim on the alternative grounds that her severance benefits are not covered by the Wage Act.[3]

**V.**

For the foregoing reasons, we reverse the dismissal of Sullivan's breach of contract claim against etectRx and affirm the district court's dismissal of all other claims against etectRx and Jeffrey P. Spafford, Edward H. Hensley, and Richard J. Kruzynski. The parties shall bear their own costs.

---

[3] Sullivan also argues that payment of the severance benefits was necessary for etectRx to comply with Massachusetts's "garden leave" statute, Mass. Gen. Laws ch. 149, § 24L, which requires that non-competition agreements be supported by payments of fifty percent of the employee's salary "or other mutually-agreed upon consideration between the employer and the employee, provided that such consideration is specified in the noncompetition agreement." § 24L(b)(vii). This assertion is irrelevant to whether severance is a "wage" for purposes of the Wage Act. At best, it is an argument that the non-competition provision is unenforceable; however, because etectRx released Sullivan from the non-competition obligation in January 2022, this argument is moot.

- 20 -